CASE 39.—ACTION BY THE CITIZENS' BANK OF SHELBY-
        VILLE AGAINST BEN L. BRUNER, SECRETARY OF
        STATE TO DETERMINE WHETHER THE BANK
        HAS THE RIGHT TO ESTABLISH ONE OR MORE
        BRANCHES.—June 15, 1909.

## Bruner, Secy. of State v. Cit. Bank of Shelbyville.

Appeal from Franklin Circuit Court.

R. L. STOUT, Circuit Judge.

Judgment for plaintiff, defendant appeals.—Re-
versed.

Banks and Banking—Branches.—Ky. St. 1909 Sec. 538 (Russell's
    St. 2121), provides for organization of banking corporations.
    Section 542 (Russell's St. Sec. 2126) provides that the corpo-
    rations shall have power to prescribe by-laws for its govern-
    ment not inconsistent with laws.  Sections 538 to 598, inclu-
    sive, containing the general stautory provision as to incorpo-
    ration and those relating particularly to banks and banking
    give no power expressly to banks to establish branches.  Held,
    that it is not within the power of a state bank to establish
    a branch bank, but it may have agents to receive and forward
    money to the bank or transact other necessary business.

JAMES BREATHITT, Attorney General, and CHAS. H. MORRIS
for appellant.

We submit that the right to operate a branch bank not being
conferred by statute, it is prohibited by implication.

### AUTHORITIES CITED.

Ky. Statutes Sec. 538, 567, 550 579, 582, 593, 619, 604, 587, Bank v. Tate, 122 N. C. 313; People v. Oakland County Bank, 1 Doug. (Mich.) 282; Zane on Banks and Banking, Sec. 24; Sections 5136, 5154, 5155, Compiled Statutes United States; National Bank of Genessee v. Whitney, 24-442; Logan County Nat. Bank v. Townsend, 139 U. S. 67; Billings v. Providence Bank, 4 Peters 514; Richmond R. R. Co. v. Lonesa R. R. Co., 13 How 71; Pennock v. Cos, 23 How 117; Proprietors of Charles River Bridge v. Proprietors Warren Bridge, 11 Pet. 420; (11:773 L. Ed.)

WILLIS & TODD for appellee.

### AUTHORITIES CITED.

Sec. 616, Kentucky Statutes; Sections 539-657 Kentucky Statutes; Citizens' Bank v. Tatell, 22nd S. C. 313; William Schallengerger &c., 4 Parte, 96 U. S. 369; Morse on Banking, Vol. 1, Sec. 7; Baltimore & Ohio R. R. Co., v. Koontz, 104 U. S. 518; Thompson on Corporations, Vol. 1, Section 691; Merrick v. Santvoord, 34 N. Y. 208.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The question presented by this record is: Has a state bank the right to establish and maintain one or more branches?

The Citizens' Bank of Shelbyville was incorporated by a special act of the Legislature of Kentucky before the adoption of the present Constitution. Its charter conferred upon it the right to establish a bank at Shelbyville, Ky., with the usual banking powers and privileges. After the adoption of the present Constitution it accepted its provisions, and became subject to the general banking laws of the state that will be hereafter noticed. In 1906 it procured an amendment to its charter under authority of section 574 of the Kentucky Statutes, authorizing it to do a general banking business at other places in Shelby

county, Ky.  After thus amending its charter, it es-
tablished a branch bank at the town of Waddy, in
the county of Shelby, and has since continued to op-
erate this branch as the "Citizens' Bank of Waddy,
Branch of Citizens Bank of Shelbyville."  It is aver-
red in the petition brought by the bank against Ben
L. Bruner, Secretary of State, to enjoin him from
interfering with its conduct or operation of the
branch bank at Waddy, that "Waddy is the only
place in Shelby county or elsewhere that it is oper-
ating a branch bank, and that said branch bank is
under the supervision, direction and control of the
directors and officers of the parent bank, viz, the Citi-
zens' Bank of Shelbyville, and is a part and parcel
of said bank, and makes all its contracts and does all
its business in the name of said bank, and does noth-
ing but a banking business, and all its money and
real estate is invested in the name of the Citizens'
Bank of Shelbyville, and is owned, held and con-
trolled by said bank."  The branch bank at Waddy
has a cashier and clerks, receives money on deposit,
pays it out on checks drawn on the branch bank at
Waddy, and purchases and discounts commercial pa-
per.  In short, it does a general banking business,
but it is done under and in the name of the "Citizens'
Bank of Waddy, Branch of Citizens' Bank of Shel-
byville."    The parent bank in making the publica-
tions and reports required by law includes in them
all the business done by its branch bank the same as
if the business had been transacted at the office and
place of business of the main bank in Shelbyville.
The Secretary of State, who is charged by law with
the general supervision of state banks in the state,
contends that a state bank has no power or authority

to establish, operate or maintain any branches. On the other hand, it is insisted by counsel for the Citizens' Bank that a bank may set up and conduct branches if the power to do so is conferred upon it by its charter, and that this authority was conferred by the amendment to its charter. At the outset it may be remarked that the Citizens' Bank of Shelbyville has no privileges or powers conferred upon it by its charter that are not enjoyed by all other state banks in the state. If this bank can establish a branch bank, then every state bank in the state can do the same thing, as all of them have precisely the same powers and privileges. What one may do all or any less number may do. We may also observe that, if a bank can establish one branch bank, there is no reason why it could not establish two or a dozen or even more; for, if the power is once conceded, then there is no limitation upon the number. And so, if branches can be established, they may be located at any place in the state. The fact that the branch is established in the same county as the parent bank can not affect the question. What a bank can do in one county of the state it may do in any of them. County lines can not be allowed to confine the activities or limit the business privileges of a bank. No sound reason, nor indeed any reason, can be given why it would be legal to have branches in a county in which the parent bank was located and illegal to establish them in other counties. Nor does the amount of capital stock that a bank may have enter into the question, except that, if the parent bank has not the amount of capital necessary to operate in a city of over 50,000 inhabitants, it could not establish in such city a branch. Subject to this exception, banks with

$15,000 capital stock have all the powers and privileges conferred upon banks with a capital stock of $500,000, and, if a bank with a capital of $500,000 can establish one or more branches, so may a bank with $15,000 capital.  From these general statements it will be seen that the whole case turns upon the single question of power, and that neither the capital of the parent bank nor the number of branches it may establish nor the counties in which they are located has any part in the solution of the question.

Let us now inquire where the power, if any, to establish a branch bank is found.  That it is not conferred by the statute, unless by implication, is conceded; but it is strongly urged in brief and argument that the power in the case of the bank involved in this litigation is found in the amendment to its charter.  Therefore, it becomes important to determine whether or not the amendment has the force and effect claimed for it.  In the consideration of this feature of the case it is not necessary to inquire what privileges or powers were conferred by the special legislative charter under which it was organized, and that was granted to it prior to the adoption of the present Constitution because under section 573 of the Kentucky Statutes the general law upon the subject of corporations, including banks, applies to and governs all corporations previously organized, and repeals all privileges or immunities inconsistent with the provisions of the general law relating to corporations, or that could not be obtained under the general law.  In addition to this, the Citizens' Bank of Shelbyville in the manner provided in section 190 of the Constitution expressly surrendered any charter rights that it possessed in conflict with or inconsist-

ent with the Constitution and laws made thereunder.
So that in determining what powers and privileges
the Citizens' Bank of Shelbyville acquired under the
amendment to its charter we must look to and be
controlled by the general laws upon the subject which
are found in the chapter on Corporations, in the
Kentucky Statutes embracing sections 538 to 598, in-
clusive.  If the amendment to its charter was not
authorized by these general laws, then the amend-
ment can not be allowed to have any force or effect.
It can not be maintained that a corporation may by
the mere wording of its charter or an amendment
thereto be empowered to do things not permitted by
or that are inconsistent with the general statute law
under and by virtue of which it is created, and from
which it derives all the powers and privileges that it
has.  When we desire to know what business a cor-
poration may engage in, or what powers are confer-
red upon it by its articles of incorporation, we must
look, first, to the law under which it was created, and,
second, to the articles of incorporation, which must
conform to or at least not be inconsistent with these
laws.  If the articles of incorporation were held to
be the sole guide by which to measure the rights and
powers of corporations, there would be no limit upon
what they might do, except the discretion or judg-
ment of the incorporators.  But it was not intended
that the important business powers and privileges of
a corporation should be left to the unrestrained in-
clination of the persons who obtained the articles of
incorporation.  The statute leaves no room for doubt
upon this question.  It fixes with careful precision
how corporations shall be created and what powers
they shall have under articles of incorporation.  Noth-

ing is left to the discretion of the incorporators or
officers except to conduct the business of the corpora-
tion within the  limitation  provided in the statute.
This is made plain by section 538, which is applica-
ble to banks as well as other corporations.   It pro-
vides that: "Any number of persons, not less than
three, may associate to establish a corporation for
the transaction of any lawful business, or to promote
or conduct any legitimate object or purpose under
the provisions of, and subject to the requirements of
this article; but banking, building and loan, trust, in-
surance and railroad corporations shall, in addition
to the provisions of this article, which are not incon-
sistent with the laws relating especially to them, be
organized in the manner and subject to the provis-
ions of such laws." And section 542 provides that,
when the articles of incorporation are filed and re-
corded as provided by law, the corporation shall have
power "to prescribe  by its board of  directors by-
laws for the government of the corporation not in-
consistent with law and exercise subject to law such
powers as may be necessary to conduct the business
or promote or carry on the objects and purposes for
which it was organized." And in other sections in
the chapter there is pointed out with particularity
the powers and privileges conferred upon corpora-
tions, especially banks.   Within these statutory pro-
visions their general powers must be confined; and
any attempt to confer by a charter provision privi-
leges not authorized by the statute, expressly or by im-
plication, or that is in conflict with it, is a nullity. If,
then, the amendment to the charter is to be given any
force and effect, it must be because it was authorized
by the statue by implication, or follows as a neces-

sary incident to the powers granted for the purpose of enabling the bank to carry on the business for which it was organized. If the statute permits banks to have branches and the articles of incorporation so provide, no legal objection can be interposed to the establishment of such branches. But, if the statute does not by implication permit the creation of branch banks, or their creation does not follow as an incident to the powers granted by the charter under the law, the authority can not be conferred by articles of incorporation.

In this connection the argument is made that, as the statute does not forbid the establishment of branches or make any mention of the matter, it follows that banks should be allowed the same privileges as other business corporations created under the statute; and, as other business corporations have the authority by implication as a power incident to their business to set up as many branches as they like, so should banks enjoy this privilege. The statute does not in terms authorize commercial or manufacturing corporations to have branch places of business, nor does it deny them this right. The statute is silent upon this subject, both as to banks as well as all other corporations; but it is a matter of common knowledge that all large commercial and manufacturing corporations do have branch places of business, many of them in other states than the home of the corporation, and that at these branches they carry on business in the same way as they do at their main or principal office or place of business. And the right to thus carry on a legitimate business by a corporation duly organized has never so far as we are aware been questioned. It would seem, therefore, that, if

banks are to be denied privileges in this respect that are enjoyed by other corporations, some good reason should be advanced to support the discrimination. That there is sound reason for this discrimination we think can be demonstrated. Primarily it grows out of the peculiar nature of the banking business, and is supported by a fair construction of the statute and by a sound public policy. Banks are quasi public corporations. They may only be organized in such manner and do such things as the state in which they carry on business permits them to do; and in carrying out its policy the state has surrounded banking privileges with many wholesome restraints that are not applied to ordinary corporations. This is manifested in the various sections of the statute relating to corporations and banks. To illustrate: The statute provides in section 538, supra, that banks in addition to the provisions relating to corporations generally shall be governed by and subject to the provisions of the law relating exclusively to banks. Among these provisions that apply to banks, and not to corporations generally, we may notice the following: (1) Ordinary corporations may be organized by not less than three persons and with any amount of capital stock, while not less than five persons can associate to establish a bank, and the capital stock shall not be less than $15,000, and in cities of 50,000 or more population not less than $100,000. (2) At least 50 per cent. of the capital stock in a bank must be paid in, in money, before it is authorized to commence business, and the remainder within one year; whereas, in other corporations the only requirement is that at least 50 per cent. of the capital stock shall be in good faith subscribed before it shall be author-

ized to transact any business with persons other than its stockholders, and the capital stock may be paid at such times and in such amounts as the directors may require. (3) The money of banks can not be employed directly or indirectly in any enterprise or business except the " business of banking by discounting and negotiating notes, drafts, bills of exchange and other evidences of debt and purchase of bonds, receiving deposits and allowing interest thereon, buying and selling exchanges, coin and bullion, and lending money on personal or real security." There is no such limitation in the statute respecting other corporations, and they may invest their money in any business or enterprise that is authorized by the charter. (4) The amount in which a person, firm or corporation may become indebted to a bank is fixed by statute, but in this particular other corporations are unrestrained. (5) Banks are required at all times to keep on hand a specified per cent. of their deposits, and this reserve fund is carefully protected by restraining provisions, from which other corporations are exempt. (6) Banks are required to make reports of their condition to the secretary of state once in every three months, or oftener if required, and to publish these reports; but other corporations need not do this. (7) The stockholders in banks are liable for the debts in an amount equal to the extent of their stock at par value in addition to the amount of such stock, although stockholders in corporations generally are not subjected to this additional burden. In other words, the state through its legislative department has at all times exercised a careful and wholesome supervision over banking institutions for the purpose of protecting the general public from

loss, while it has not, except in a general way, under-
taken to control or interfere with the conduct of pri-
vate corporations not invested with a public charac-
ter or performing some public service. As further
and forcibly illustrating the extent to which the state
has gone in its control of banking interests, it may
be noted that private banks are not allowed to be es-
tablished and that all banking institutions must be
incorporated. And this right of the state to deny
to individuals the privilege of engaging in the bank-
ing business is generally sustained as a legitimate ex-
ercise of the police power, although the state would
not have the power to prevent persons from engaging
in other legitimate business pursuits. State of N.
Dakota v. Woodmansee, 1 N. D. 246; 46 N. W. 970; 11
L. R. A. 420; People v. Utica Ins. Co., 15 Johns. (N.
Y.) 358, 8 Am. Dec. 243. From these general but im-
portant distinctions that the Legislature has made be-
tween banks and corporations generally, it is appar-
ent that banks can not be allowed to exercise any
functions that are not strictly authorized by law.
What a mercantile corporation may do is not the
standard by which to measure the powers of a bank-
ing institution. They occupy towards the public a
very different relation. The number of branches or
places of business that the mercantile corporation
may establish, concerns no one except the stockhold-
ers and the creditors of the corporation. The public
generally have no interest in its business nor any
right to control or direct its affairs. But the whole
body of the public is directly interested in the con-
duct and management of banking institutions because
they are depositories in which is kept practically all
the money of the country; and it is with the money

so deposited that banks are enabled to successfully carry on a profitable business. The money employed by other corporations is usually confined to that paid in by the stockholders or borrowed; while the greater part of the money employed by banks is money that has been placed with them by depositors for safe-keeping. It is therefore of the highest importance that the business of banking should be carefully supervised by the state in the interest of the public, and surrounded by such salutary safeguards as will maintain the solvency of these institutions. The loss occasioned by the failure of a private corporation is generally confined to the stockholders and creditors, while the failure of a bank brings ruin and disaster to the hundreds and often thousands of people who have placed with it on deposit their earnings, and it is to secure this depositing public from loss that the state through its agencies exercises a supervisory care over banking institutions. To extend by implication the powers of a bank by allowing it to exercise privileges not necessary to carry on the business would be to increase the probability of loss to the public by its mismanagement or failure. While we are not disposed in any wise to curtail the powers essential to the proper conduct of the business, it does not seem to us that the establishment of branches is either prudent or necessary. Looking at the matter from a business standpoint, it is important that a bank should only have one place of business. The management and safe investment of money requires constant and painstaking care and attention, as well as sound and discriminating judgment on the part of the officers of a bank. These officers, or the majority of them usually live convenient to the place

where the bank is located; and, although in many small institutions the routine of affairs is under the immediate control and direction of the cashier, the president and some of the directors are daily in and about the place of business, keeping a watchful eye on how it is conducted. But, if branches were established, they must in the necessity of things be left almost exclusively to the persons immediately in charge, free from the influence and presence of the officers and directors, and this practice would not in our judgment be conducive to safe and conservative banking methods. Upon this point it is well said in Morse on Banks and Banking, Sec. 46: "A bank has its legal home in the state by which it is created, or, in case of a national bank, the state in which it is located or organized. Its domicile is there, and it is a citizen of that state in reference to suing in any state or federal court. It can not transfer its franchises into any other sovereignty. 'It exists by force of the law creating it, and where that ceases to operate it can have no existence.' But such ordinary business as its organic law gives it power to do it may by its agents transact in any other state, unless prohibited by its charter, or by the laws or policy of such other state. Agencies for specific purposes, as for the redemption of bills or the dealing in bills of exchange, may be established in other places. In these cases it is for the convenience of the public that such should be the case. But there is no case which holds that an agency for the exercise of the more important and valuable functions, such as issuing circulating paper or discounting notes, or an agency designed to carry on the general business of banking, would be regarded as legal; for such nominal establishment of agencies

might easily result in the practical establishment of
a network of branch banks throughout the home state
or in other states. * * * Some business as receiving
deposits, certifying checks, and giving information
of most kinds must be done at the banking house, or
place set apart for those purposes by the bank, and
can not be done so as to bind the company by an offi-
cer away from the bank.  Other business, as receiv-
ing information, and collecting debts, may be done by
an officer away from the bank.''

If branches were necessary to enable banks to
carry on their business, we would not be disposed to
interfere with their establishment; but this feature
of the case does not present any difficulty, because
it can not be said that branches are necessary to en-
able a banking institution to fulfill the purposes of
its creation, although they might widen the field of
its opportunities and increase its capacity to earn
money for its stockholders.  But neither the prospect
of advantage to the stockholders nor the convenience
to the community in which the branch is located
should be allowed to have much weight in determin-
ing the wisdom or advisability of their existence.  The
important consideration is the security of the public,
and that the public will be better protected by not
allowing banks to establish branches we have little
doubt.  This matter of branch banks by implication
or as an incident to the power to carry on a banking
business is a comparatively new feature that has been
introduced in some banking circles, and is a depart-
ure from the rule that has obtained in this state from
the beginning.  When banks were incorporated under
special laws, it was not unusual for the Legislature
to give them by express authority the right to estab-
lish branches; and, under the authority so granted,

several branches were in operation when the present general law upon the subject of banking was enacted, but, when the Legislature came to enact this general law under which all state banks have their existence and from which they derive all their powers, it omitted all reference to branch banks, although it must have been within the knowledge of practically all the members of the General Assembly that branch banks were being conducted under special acts. The fact that no provision was made in the general law for branch banks is significant as illustrating that it was not the purpose or policy of the state to further encourage or permit them. If the General Assembly had deemed it wise to permit banks to establish branches, it would have so declared, and the failure to speak on so important a subject furnishes strong reason why this privilege not necessary to the enjoyment of the powers conferred by the statute and the charters obtained thereunder should not be conferred by implication. In addition to this, when the Legislature fixed the amount of capital stock that a bank must have before commencing business, graded in some respects according to the population and needs of the community where the bank was to be located, it was certainly not contemplated or intended that upon this capital designed to be employed in one locality a bank might set up an unlimited number of branches and do a volume of business upon money received from depositors in widely separate communities entirely disproportionate to the capital invested. The capital stock of a bank and the double liability of the stockholders is the security to which depositors must look for the protection of their deposits and to permit a bank with a capital of say

$15,000 to have a number of branches doing a general banking business would greatly lessen the security of the depositors, and at the same time increase the probability of loss. It seems to us that, if branch banks are to be allowed, there should be set apart for the use and benefit of each branch not less than the amount of capital stock required in the organization of banks, and this was the policy pursued by the Legislature in permitting banks incorporated under special acts to have branches at different places in the state. But the scheme under which it is insisted that the Citizens' Bank of Shelbyville and other institutions may establish branches does not contemplate or provide that there shall be any increase in the capital stock; the argument being that, when a bank is organized with the capital required by law for the conduct of the banking business in the place at which it is proposed to locate the bank, it may without any increase in its capital set up as many branches as it chooses, and where it pleases, and at these various places do a general banking business without any capital set apart for the purpose, although each of these branches is in itself virtually a distinct and complete banking institution, exercising and enjoying all the powers and privileges conferred upon chartered banks, and yet free from the duties and obligations imposed by law upon incorporated institutions. We can not give our assent to a scheme like this.

Other reasons might be advanced against granting the powers contended for, but we consider these sufficient to support the conclusion we have reached that, in the absence of express legislative authority, the power to establish branch banks does not follow by

implication as a reasonable or necessary incident to the right to do a banking business.  This construction does not mean that banks may not have agents. There is a wide difference between the appointment of agents to receive and collect money and forward it to the bank or to transact other business necessary or incidental to banking and the right to establish branch banks at which a general banking business is carried on. A bank may have as many duly appointed agents as its needs require, and these agents, among other things, may receive and forward to it at its place of business the money of persons who desire to deposit with it.  We believe that safe and conservative banking methods, the protection of the public, the security of depositors, and the interests of the stockholders all demand that banks shall have only one place at which "to carry on the business of banking and discounting and negotiating notes, drafts, bills of exchange, and other evidences of debt, and purchasing bonds, receiving deposits, and allowing interest thereon, buying and selling exchange, coin, and bullion, and lending money on personal or real security." And that to legalize by judicial construction a departure from this course would soon result in failure that would do infinite harm to the banking interests of the state, and bring disaster to numbers of innocent people.

Wherefore the judgment of the lower court is reversed, with directions to dismiss the petition.