Leon **GRIFFIN**, Appellant,

v.

**HOLIDAY INNS OF AMERICA** et al.,
Appellees.

No. 11746.

Court of Civil Appeals of Texas,
Austin.

March 25, 1970.

Rehearing Denied April 8, 1970.

Second Rehearing Denied April 15, 1970.

Hooper & Robinson, Malcolm Robinson, Austin, for appellant.

Wallace T. Barber, San Marcos, Waitz, Bretz & Collins, Bruce Waitz, San Antonio, for appellees.

HUGHES, Justice.

Appellant, Leon Griffin, sued Holiday Inns of America, called "Contractor" and San Marcos Motel Company, called "Owner," the first named being a foreign and the latter named being a domestic corporation, upon a contract between appellant called "subcontractor" and contractor wherein appellant obligated himself to do certain paving adjacent to the Holiday Inn of San Marcos, Texas, appellant alleging that he had fully performed such contract but that Contractor had failed and refused to pay a balance of $6,538.61 due under its terms. Appellant sought recovery of this amount, attorney's fees and foreclosure of a materialmen's and mechanic's lien on the Motel, the property of Owner.

Appellees filed an answer and cross-action. The answer consisted of special exceptions, a general denial and a further answer alleging that appellant had not performed the contract, listing eighteen specific violations of the contract. Appellees prayed that appellant take nothing by his suit, that the cloud cast by the lien be removed and that they recover $6,812.27 which they had paid on the contract.

Appellees' cross-action alleged that in order to correct the deficiencies in the performance of the paving contract by appellant an expenditure of $18,073.20 by them

would be required, and they prayed for judgment in this amount.

There is no allegation in any of the pleadings that appellant intentionally or in bad faith failed to perform the contract according to its terms.

Trial was to the court without a jury. The Trial Court rendered a formal take nothing judgment against appellant on his suit and similarly against appellees on their cross-action, removed the cloud on the title to the Motel cast by the asserted lien and divided the costs one half to appellant and one half to appellees.

No findings of fact or conclusions of law were requested of or filed by the Trial Court.

Appellees excepted to the judgment, gave notice of appeal but did not file an appeal bond or make a deposit in lieu of bond. They have filed a cross point in their brief.

Appellant does not suggest, and his pleadings would not support any right of recovery based on quantum meruit.

Appellant has three points the substance of which is that there is no evidence or insufficient evidence to support the judgment against him.

We have appraised these points under the rules stated in King v. King, 150 Tex. 662, 244 S.W.2d 660 (1951).

We overrule all three points.

The essence of the contract between the parties to it is contained in Sec. 2, which we quote:

"Section 2. The Subcontractor and the Contractor agree that the materials to be furnished and work to be done by the Subcontractor are furnishing all labor, material, and equipment to install six inch base to be layed in 2, 3" layers compacted by power compacters, plus 1½" hot-mix asphalt. Prior to installing base material, all fill and ground work must be compacted to 95% density. The dirt work includes the inner court yard around swimming pool and under canopy, and all areas covered by asphalt. Including driveways out to Loop 82, and installing drainage tile furnished by prime contractor. Over the prepared stabilized aggregate base cover, install an asphaltic primer at the rate of .6 gallons per sq. yd. Binder topping shall conform to the state highway department specifications for parking areas and driveways in locality of project. Furnish certifications of compliance. Base and topping shall be so installed without depressions where water may collect. The subcontractor shall clean the job of any debris caused by his phase of work, and nothing but a first class job will be accepted. Any thing not mentioned in this contract will be covered according to these specifications."

The date of the contract was February 29, 1968. While not so specified in the contract, appellant agreed that the job would be completed by March 28, 1968. The reason for the time agreement was that the Motel had a convention scheduled on that date and the opening of Hemisfair was near.

The contract price was $13,000 for 7,000 or less sq. yds. of paving and $1.72 per sq. yd. additional above this amount. Appellant claimed 204 additional sq. yds. The cost of materials for this job, $6,812.27, was paid by appellees directly to suppliers and is not involved here. Appellant sought recovery of $6,538.61 plus attorney's fees.

The evidence shows that the materials delivered to the job site were adequate to comply with the requirements of the contract for a six inch base and a one and one half inch layer of asphalt topping.

There is no evidence that any of this material was diverted from this job.

Raymond Canion, a graduate engineer, who was highly qualified as an expert in paving work, testified for appellant. Mr. Canion examined the parking lot in suit on June 29, 1969. He testified that the pav-

ing was "as satisfactory as any in this town," that the job was not perfect and that there were depressions on the surface but it had "no more depressions than an average parking lot around a college campus here or in Austin under the same type of circumstances." Mr. Canion observed considerable settling or uplift in the curbing around the parking area which was not laid by appellant and the cracking of brick in a sign and that this indicated to him that the parking area was on "an expansive clay or some type of plastic material." Under these conditions, Mr. Canion expressed surprise that the paving was in as good condition as it was after more than a year of use. Mr. Canion said that the depressions or ponding in the pavement should not cause worry although, "there are some places that are going to need some maintenance in the future like any other parking lot." He reiterated, " * * * I would say again after a year's time the fact that it is there in substantial condition is a fairly good rule of thumb or mark showing that it was a satisfactory job. * * *"

Mr. D. E. Jacobs, an employe of Engineering Testing Laboratories, Inc., also a highly qualified witness, testified for appellant. On April 10, 1969, Mr. Jacobs conducted tests of the paving at the request of appellant. He made three test holes located, he said, in areas so as to be representative of the entire lot. The result of these tests may be summarized as follows:

"First Sample: Base 7 inches, asphalt 1¾ inches

Second Sample: Base 5¾ inches, asphalt 1¼ inches

Third Sample: Base 5½ inches, asphalt 1¾ inches

Average: Base Six and a fraction inches: Asphalt One and one-half plus a fraction inches"

The record shows that in March 1968 Trinity Testing Laboratory of Austin at the request of appellees tested the sub-base

on the parking lot. The results of these tests were testified to by Mr. Alvis Vandygriff, Jr., a witness for appellees as follows:

"Q So as a result of those tests, the density at that particular time, which is March 15, was 97.8 and 96.2, was it not?

A Correct.

Q I think you gave me the various densities on the base, but you didn't read the figures on the sub-base.

A Correct. No. 1 subgrade density had 23.6 per cent moisture, dry unit weight 96.2 pounds, per cent compaction 100.5; per cent of optimum moisture 92.9. No. 2 sub-grade had 21.5 per cent moisture, had a dry unit weight of 95.9 pounds; 100.2 per cent compaction, and 84.6 per cent optimum moisture."

Appellant testified that he was informed by Mr. Don Madden, then an employe of Holiday Inns, that these tests had been made of the sub-base and the results were satisfactory.

Appellant also testified to many problems encountered by him in paving the parking lot, some of which were excessive moisture in the sub-soil, a leaking plastic pipe serving the trailer in which the overall job superintendent lived, taking water hoses used by motel construction people, urging by appellees to complete the paving on time regardless of the condition of the sub-base.

Appellant also testified that the cost of making needed repairs to the paving would be $150.00.

The foregoing evidence is, in substance, the affirmative evidence relied on by appellant to sustain his points.

We will now state some of the evidence upon which appellees rely to sustain the judgment of the Trial Court and to refute the points made by appellant.

The contract required appellant to install a six inch base to be laid in 2, 3″ layers compacted by power compacter.

Appellant concedes that he did not lay the base in this manner but rather, he windrowed the material, a manner which he said was just as good.

Trinity Engineering Testing Corporation tested this job in May 1968, about one month after its completion for appellees. They dug four test pits. This was accomplished by digging all the way through the pavement to the sub-grade; first they removed the asphaltic pavement by using a saw or an ax, laid the pavement out of the way; took compaction tests on the base material; removed all of the base; took compaction tests on the sub-grade and then measured the thickness of the pavement and of the base. These tests showed that the thickness of the base material was less than 4½ inches in each test hole.

Trinity Testing also conducted extensive testing of this job in April 1969. They penetrated the paving area at 155 points where the thickness of the base material was measured by means of a depth gauge. 103 of the test points showed base material to be less than 5¾″ thick. Mr. Vandygriff testified that the average thickness of the base material was 5.37″, as shown by averaging the 155 tests.[1]

Appellant's witness, Mr. Jacobs, testified that only in one of three test pits made by him did he find at least 6″ of base material.

The contract also required appellant, "Prior to installing base material, all fill and ground work must be compacted to 95% density."

Appellant's witness, Mr. Jacobs, testified that in the three tests he made the density of the sub-grade was less than 90%.

Mr. Charles D. Gentry, an employe of Trinity Testing, testified that in four test pits dug in May 1968, the compaction of the sub-base was shown to be 86.9, 72.8, 78.5 and 94.4, respectively.

Mr. C. A. Austin, a qualified witness for appellees, testified to the importance of an adequate base and sub-base in that without proper compaction of base and sub-base failures consisting of cracks and depressions in the paving will occur. Mr. Austin also emphasized uniformity in the base and sub-base illustrating that if a certain compacted base and sub-base is deemed adequate for the anticipated load, it would not do to have more than is required in one place and less than is required in another place because the weak places would cause failures and trouble.

The contract also provided that "Base and topping shall be so installed without depressions where water may collect."

The evidence is undisputed that there was puddling and ponding on the pavement following rains. This fact is affirmed by appellant's witness, Mr. Canion, also by witnesses Kelly and Vandygriff, and is substantiated by pictures. The importance of avoiding ponding is that since asphalt is pervious standing water will drain into and damage the base material.

Three witnesses testified that appellant did not perform his contract in a good and workmanlike manner. Two witnesses, including appellant, testified that he did.

There is also evidence to support implied findings that appellant failed to maintain an adequate working force, failed to provide adequate drainage for the parking lot, failed to correct job to contract specifications at his own cost, failed to furnish a certificate of compliance and failed to do a first class job.

1. These tests show the following variations in the thickness in inches of the base material: 3, 3¾, 3, 2¾, 6½, 3, 6, 5, 6, 4, 4, 5½, 4½, 4½, 3½, 8, 4, 5, 3, 4½, 5, 6½, 6, 5, 6½, 4, 8, 8¾, 8½, 4½, 6½, 4½, 8, 11, 7, 6, 8¾, 6, 5¾, 5¼, 7½, 8¾, 7¾, 3¼, 4¼, 7¼, 5, 3¼, ½, 10, 5½, 7, 7¼, 10, 5, 6½, 10½, 4½, 6½, 5, 5¼, 5, 5, 5½, 5, 3¼, 10, 5, 7, 5½, 4, 4, 4, 4, 3½, 5, 5 and 3.

522

Mr. C. A. Austin, a witness for appellees testified:

"Q Mr. Austin, have you, based upon your experience as a paving contractor and looking at the parking lot as you have observed it today, arrived at a conclusion or I should say, arrived at an opinion with respect as to how the deficiencies can be corrected?

A It would be hard to say. I have come to a partial conclusion, yes, sir.

Q This is your opinion?

A Yes, sir.

Q What in your opinion is the best method for correcting the conditions that exist?

A Only way I could see it if you want a first class job is to re-do it and put it according to the specifications that it was bid.

Q What would be necessary in order to re-do that job?

A You will have to take all the asphalt off, and that would be wasted. You might be able to salvage part of your base material. Then go in and put your sub-grade to grade.

Q Go in and put your subgrade to grade?

A Yes, sir. Then bring your base material back on out.

Q You said you could salvage only a part of the base material?

A Yes, sir.

\* \* \* \* \* \*

Q Would, in your opinion, a skin patch correct the conditions which you have observed there today?

A A skin patch will only correct the water problem where it is puddling.

It will not correct chug holes and the cracked surface there.

Q It won't correct the base deficiency, will it?

A No, sir."

Mr. Austin testified that to re-do the job according to specifications and assuming a reasonable salvage of base material, the cost would be more than $2.25 a square yard.

■ Substantial compliance, not literal compliance, is all that is required for a contractor to recover on a building or construction contract. The rule is stated in 10 Tex.Jur.2d, Building Contracts, Sec. 21, p. 25, as follows:

"Substantial performance is regarded as full performance, insofar as the rule that performance is a condition precedent to the right to recover on the contract is concerned; a contractor who has in good faith substantially performed may sue under the contract.

Although substantial performance does not mean an exact performance in every slight or unimportant detail, it means a performance of all important particulars and permits only such omissions or deviations from the contract as are inadvertent and unintentional, are not due to bad faith, do not impair the structure as a whole, and are remediable without doing material damage to other parts of the building in tearing down and reconstructing; when the necessary elements are not present the doctrine is not applicable even though the work is as good or as valuable to the owner as that agreed to be done."

See South Texas Building Co. v. Ideal Engineering, Inc., 402 S.W.2d 292, Tex. Civ.App., Houston, writ ref. n. r. e. (1966).

■ The implied finding of the trial court that appellant did not perform the contract in all important particulars is, in our opinion, supported by evidence having

adequate probative value. We are also of the opinion that such finding is not so against the great weight and preponderance of the evidence as to be manifestly unjust. The important particulars in which appellant failed to perform his contract are in failing to provide a uniform base and sub-base as required by the contract and in failing to lay a depressionless paving surface. These failures prevent the conclusion that the contract was substantially performed by appellant. It is beyond dispute but that the paving lot has been of value to appellees. It has been used and is usable for parking purposes. Recovery for the value of this utility has not been sought and cannot be considered by us.

We find no evidence that appellant has been guilty of bad faith in failing to substantially perform his contract. The time element involved, weather and soil conditions and equipment failures all seem to have combined to cause nonperformance of the contract in its important particulars. These matters honestly explain but do not legally excuse the consequences of appellant's failure to substantially perform the contract.

We overrule appellees' counterpoint to the effect that it was entitled to recover on its cross-action wherein it sought to recover the cost of reworking the job alleged to be $18,073.00. Appellees alleged that the damages were caused by the failure of appellant to complete the work "in a workman like manner." It was not alleged that appellant willfully, intentionally or in bad faith failed to complete the job in accordance with the contract.

The measure of damages under the circumstances alleged by appellees and under the implied finding of the Trial Court that the contract was not substantially performed and that the job would have to be re-done at great cost to make it substantially comply with the contract is the difference between the value of the paving as installed and its value had it been installed

in accordance with the contract. Hutson v. Chambless, 157 Tex. 193, 300 S.W.2d 943 (1957). There is no evidence in this record enabling the Court to apply this measure of damages.

The judgment of the Trial Court is affirmed.