**MONARCH LIFE INSURANCE COMPANY, Appellant,**

v.

**TRINITY INDUSTRIES, INC., Appellee.**

**No. 18095.**

Court of Civil Appeals of Texas, Dallas.

May 3, 1973.

Paul Shoop, Thompson, Knight, Simmons & Bullion, Dallas, for appellant.

Larry M. Lesh, Locke, Purnell, Boren, Laney & Neely, Dallas, for appellee.

BATEMAN, Justice.

Monarch Life Insurance Company appeals from a summary judgment that it take nothing by its suit against Trinity Industries, Inc. for insurance premiums of $22,243. The parties will sometimes be referred to as Monarch and Trinity, respectively.

Monarch's predecessor (Standard Insurance Company) issued five policies of workmen's compensation and liability insurance to Trinity's predecessors (Cherokee Steel, Inc. and Cherokee Laboratories, Inc.). Each of these policies was for a three year term and was issued subject to a "Retrospective Premium Endorsement— Three Year—Plan D," herein sometimes referred to as "Plan D," under which the total amount of premium due would be determined by the amounts of "incurred losses." Initial standard premiums were paid under an agreement that the premium liability would be adjusted according to a certain plan based upon loss experience.

The retrospective premium endorsement in question provided in relevant part:

"(b) *Retrospective Premium.* A computation of the retrospective premium applicable to the first annual period, *based upon* the standard premium and *incurred losses for such period, such losses to be valued as of a date six months after the expiration of such period,* shall be made by the company as soon as practicable after such valuation date.

A computation of the retrospective premium, applicable to the first two annual periods, *based upon* the standard premium and *incurred losses for such periods, such losses to be valued as of a date six months after the expiration of the second annual period,* shall be made by the Company as soon as practicable after such valuation date.

A computation of the retrospective premium, *based upon* the standard premium and *incurred losses for the 3-year period, such losses to be valued as of a date six months after the expiration of such period,* shall be made by the Company as soon as practicable after such valuation date.

Such computation of the retrospective premium for the 3-year period shall be final if (1) all claims have been closed or it is apparent that the retrospective premium will exceed the maximum retrospective premium, and (2) within 90 days from approval of such computation by the organization having jurisdiction, the Company, with the agreement of the Insured, requests of such organization that the computation be final.

If such computation is not final, a further computation of the retrospective premium, *based upon incurred losses valued as of a date eighteen months after termination of the policies,* shall be made by the Company as soon as practicable aft-

er such valuation date. Such further computation shall be final unless, within 90 days from approval of such computation by the organization having jurisdiction, the Company or the named Insured requests of such organization that a further computation be authorized. Any subsequent computations, to be made only at intervals of 12 months, shall each be subject to a similar procedure." (Italics ours.)

The plan defined "incurred losses" as the sum of all losses actually paid, reserves for unpaid losses, premiums on bonds paid by the insurer as required by the policies, accrued interest on judgments against the insured, and loss adjustment expenses.

Plan D thus provided for interim computations by the insurer of the premiums for each of the three annual periods of the policies. Interim computations were made covering the first two. The policies were cancelled December 14, 1961, two and a half months before the end of the third annual period. A third computation was made on or about January 3, 1963 which purported to cover the entire period covered by the policies. This was called the "First Full Adjustment," but was not designated, and was not considered at the time, as the final adjustment. It showed a return premium or credit due the insured in the sum of $8,627, which was paid to it on or about August 15, 1963.

Since the computation of January 3, 1963 was not final, the insurer was obligated by the contract to make "a further computation * * * based upon incurred losses valued as of a date eighteen months after termination of the policies, * * * as soon as practicable after such valuation date." This was not done. The "valuation date" was June 14, 1963, and no "incurred losses" occurring thereafter could very well be valued as of that date unless the insurer had some notice or knowledge thereabout on or prior to such date and set up reserves on such claims which could then

be valued. If it knew of any such claims and failed to include them in a computation as soon as practicable after June 14, 1963, it waived the right to compute a retrospective premium thereon.

Monarch made no further computation until April 24, 1969, nearly six years after the said valuation date, when it made its "Second Full Adjustment" which it designated as "Final." It was this computation which developed the additional premiums claimed in this suit. This computation was based in part upon three claims arising from accidents occurring during the life of the policies but which did not give rise to "incurred losses," as that term is defined in Plan D, until after the agreed "valuation date" of June 14, 1963. In one instance the occurrence on which the claim was later made was not even reported until 1964; and in two other instances large reserves were established or substantially increased in 1969. If the insurer had desired to obtain later valuation dates it had the right, under the Plan, to request from "the organization having jurisdiction" [1] authorization for further computations at 12-month intervals, but it made no such request.

Monarch argues that the computation of April 24, 1969 constituted substantial compliance with the contract as a whole and that any minor defects in its compliance did not affect Trinity's liability. It also contends that Trinity's liability is not affected by Monarch's failure to make interim adjustments because it suffered no detriment therefrom. We overrule both of these contentions.

Monarch relies on certain paving and building construction cases which hold that the contractor who has in good faith substantially performed may recover the agreed contract price less the damages sustained by his failure strictly to perform.[2] That rule has no application here.

In a case of this kind so-called "substantial" performance by the plaintiff is not sufficient to compel performance by the defendant unless he has prevented performance by the plaintiff. Colbert v. Dallas Joint Stock Land Bank of Dallas, 129 Tex. 235, 102 S.W.2d 1031, 1033 (Tex. Sup.1937); Benson v. Harrell, 324 S.W.2d 620 (Tex.Civ.App., Fort Worth 1959, writ ref'd n. r. e.); Dodds & Wedegartner v. Reed, 69 S.W.2d 165 (Tex.Civ.App., Dallas 1934, writ dism'd). It is not even contended that the insured did anything to prevent the insurer from fully performing its contract. The timely making of the final computation, based on "incurred losses" valued as of June 14, 1963, was a condition to Trinity's promise to pay and, not having performed the condition, Monarch is in no position to complain of Trinity's failure to pay. Gulf Pipe Line Co. v. Nearen, 135 Tex. 50, 138 S.W.2d 1065, 1068 (1940); Cannon v. Arnold, 467 S.W.2d 215, 216 (Tex.Civ.App., Amarillo 1971, writ ref'd n. r. e.); Great Plains Life Ins. Co. v. First Nat. Bank of Lubbock, 316 S.W.2d 98, 105 (Tex.Civ.App., Amarillo 1958, writ ref'd n. r. e.); W. T. Rawleigh Co. v. Izard, 113 S.W.2d 620 (Tex.Civ.App., Eastland 1938, no writ).

Under these circumstances the plaintiff may not avoid the consequence of its failure to perform, and insist upon performance by the defendant, by showing that the latter has suffered no detriment. However, if a showing of detriment were necessary, this clearly appears by a comparison of the return premium of $8,627 which Trinity received in August 1963, after the contractual valuation date of June 14, 1963,

---

1. The National Council on Compensation Insurance, of New York City.

2. Uvalde Rock Asphalt Co. v. Fantham, 210 S.W.2d 646 (Tex.Civ.App., Galveston 1948, no writ); Beck v. Lawler, 422 S. W.2d 816 (Tex.Civ.App., Fort Worth 1967, writ ref'd n. r. e.); Griffin v. Holiday Inns of America, 452 S.W.2d 517 (Tex.Civ.App., Austin 1970, no writ); Garland Grain Co. v. Bailey, 393 S.W.2d 945 (Tex.Civ.App., Dallas 1965, writ ref'd n. r. e.).

with the additional premium charge of $22,-243 resulting from the computation based upon valuations made several years after the agreed valuation date.

Monarch also argues that Trinity "waived any right it may have had to terminate the contract by acting as if it remained in full force." This contention is based on the deposition testimony of E. B. Breeding, vice-president and treasurer of Trinity, and certain letters written by him in 1964, 1967 and 1969 indicating that he was of the opinion, and understood, that final adjustment of the retrospective premium plan could not be made until all known claims had been disposed of and that when that was accomplished Trinity would be entitled to a substantial refund. His opinion in this respect was erroneous. There was nothing in this evidence to raise an issue of waiver by Trinity of Monarch's performance of its contract. It shows no intent on Breeding's part to waive any of Trinity's rights; there was nothing in it which could have misled or deceived the insurer or caused it to change its position. This contention is also overruled.

All of Monarch's points of error are overruled and the judgment is affirmed.