**GREAT PLAINS LIFE INSURANCE COMPANY, Appellant,**

v.

**The FIRST NATIONAL BANK OF LUBBOCK, Texas, Appellee.**

No. 6692.

Court of Civil Appeals of Texas.

Amarillo.

June 2, 1958.

Rehearing Denied Sept. 22, 1958.

Nelson & McCleskey and Harold O. Harriger, Lubbock, Looney, Clark, Mathews, Thomas & Harris, Austin, for appellant.

Crenshaw, Dupree & Milam, Lubbock, for appellee.

NORTHCUTT, Justice.

Great Plains Life Insurance Company, as lessor, leased to the First National Bank at Lubbock certain space in its building situated on Lots 6, 7 and 8 in Block 117 of the original town of Lubbock, Texas, for a term of 25 years, at an annual rental of $23,000 per annum, payable in equal monthly installments of $1,916.67 each and payable in advance on the first day of each month. This lease was contracted under the terms of two instruments of even date, the lease and supplemental agreement. The lease referred to the supplemental agreement and made it a part of the lease. The pertinent part of the lease provided the building would be completed and ready for occupancy not later than October 1, 1954, provided however, that in the event such construction was unavoidably delayed the lease should be binding upon the parties if said building was ready and completed for occupancy on or before December 31, 1954,

but if not completed by December 31, 1954, the lessee, at its option, might terminate the lease and all its obligations thereunder. Lessor was to complete the building in accordance with the plans and specifications theretofore agreed upon by the parties and referred to in the supplemental agreement. Both parties were to use their best efforts to obtain permission from the city to install on the west side of the building on the sidewalk on the east side of Avenue L three sidewalk teller's cages. The building was not to be considered as being completed and ready for occupancy until said permission was granted and the teller's cages installed. Lessor was to furnish, at its own cost and expense, heating and air conditioning and all public utilities except telephone services during the term of the lease. Upon default on the part of the lessor to perform any of its obligations under the terms of the lease and in the event said default continued for 30 days after the lessee gave notice to lessor of the existence of such default, lessee might, at its option, cure such default at lessor's expense and retain from the rental payable sufficient amount to reimburse it for moneys expended by it in curing such default. In the event of default by lessee in any of the obligations resting upon it under the provisions of the lease and in case such default continued for 30 days after written notice by lessor to lessee of the existence of the said default, lessor might, at its option, terminate the lease and all notices to be given were to be by registered letter properly stamped and addressed and deposited in the U. S. Mail. Said lease provided that the completion of the building as agreed upon was to be done at appellant's sole cost and expense except as provided in the supplemental agreement. There were other matters mentioned in the lease that were not necessary to mention herein.

Since the main dispute between the parties concerns the provisions of the supplemental agreement we think it best to copy it herein in full.

"The State of Texas Supplemental
County of Lubbock Agreement

"This supplemental agreement made between Great Plains Life Insurance Company, hereinafter called Lessor, and First National Bank at Lubbock, hereinafter called Lessee,

"Witnesseth:

"Whereas, the parties hereto have this day entered into a certain lease contract whereby Lessor has leased, demised and let unto Lessee, and Lessee has hired from Lessor the following space in that certain building situated on Lots 6, 7, and 8, in Block 117, of the Original Town of Lubbock, in Lubbock County, Texas, and known as the 'Great Plains Life Insurance Building' to-wit:

"All of the basement, all of the ground floor, and all of the second floor of said building, except those portions of said floors outlined in red on the floor plans attached to said lease contract, and by reference made a part thereof;

"and,

"Whereas, in order to make the leased premises suitable for occupancy by lessee, it is necessary to make certain alterations and additions to the plans and specifications for completing construction of that portion of said building to be occupied by lessee, in accordance with preliminary plans hereto attached and in accordance with the final plans and specifications agreed upon and approved and which are to be prepared by David S. Castle Company, Architects, Abilene, Texas; and,

"Whereas, the parties desire to enter into an agreement with reference to the sharing of the cost of such alterations and additions:

"Now, therefore, in consideration of the premises, and the mutual covenants and agreements herein contained, and further in

consideration of the covenants and agreements contained in the aforesaid lease contract, the parties hereto have agreed and do hereby agree as follows:

"1.

"The alterations and additions hereinabove referred to, together with the estimated cost of each item, are as follows:

| | | |
|---|---|---|
| "Item No. 1: | Plumbing for five extra toilets | $ 3,000.00 |
| "Item No. 2: | To move and install three sidewalk teller cages | 7,500.00 |
| "Item No. 3: | To move and install one drive in tellers cage in alley | 500.00 |
| "Item No. 4: | Concrete wall to north cage in basement | 350.00 |
| "Item No. 5: | New hydraulic one ton capacity elevator | 9,500.00 |
| "Item No. 6: | New concrete and steel vault construction | 16,500.00 |
| "Item No. 7: | Sound proof partitions on first floor | 2,500.00 |
| "Item No. 8: | To move existing vault doors from existing vaults and move safety deposit boxes and stainless steel lining and grill to new vaults | 8,000.00 |
| "Item No. 9: | New walnut and marble bank fixtures check desks, walnut slab doors, customers cages and walnut wainscot in lobby and offices on first floor | 26,000.00 |
| "Item No. 10: | Contingencies | 8,135.00 |
| "Item No. 11: | Architectural fees (estimated) | 2,500.00 |
| | "Total | $84,485.00 |

"2.

"Lessor shall pay $50,000.00 of the cost of the above listed alterations and additions, and lessee shall pay the balance of such cost. In this connection, it is understood that the costs above listed are estimates only, and the liability of lessee shall be the actual cost of such alterations and additions less the $50,000.00 to be paid by Lessor.

"3.

"Any carpeting to be installed in the leased premises will be paid for by Lessee.

"4.

"Upon the termination of said lease contract, the items listed as Item No. 9 above, together with the vault doors mentioned in Item No. 8, and the safety deposit boxes and stainless steel lining and grill mentioned in Item No. 8, may be removed by Lessee, it being understood and agreed that all of such items shall be and remain the property of Lessee, together with any subsequent replacements of such items. In addition, the side walk teller cages and drive in teller's cages mentioned in Items 2 and 3 which now belong to Lessee shall remain the property of Lessee, and may be removed upon the termination of said lease.

"5.

"In addition to the other obligations resting upon the Lessor under the provisions of said lease contract, Lessor agrees that it will make available for the use of customers of said bank adequate parking facilities at a distance of not to exceed two blocks from the demised premises, and all charges not to exceed the usual and customary charges for similar parking facilities in Lubbock, Texas.

"6.

"In the event the side walk teller cages referred to in Paragraph 4 of this agreement are removed by Lessee, Lessee shall cover the resulting holes in the side walk with steel plates in such manner as to prevent persons using the side walk from falling into such holes.

"Executed this the 8th day of April, A. D., 1954."

At the time the lease and supplemental agreement were entered into the building was not completed and was not completed until sometime in June 1955. During the time the alterations mentioned in the supplemental agreement were being completed, it was determined that it was not practical to install the three sidewalk teller's cages, and the appellee leased property across the alley at the rear of the building for the same period of 25 years and erected drive in cages thereon at its own expense, and constructed a tunnel from said teller's cages

across the alley to the sidewalk adjoining the appellant's building and also constructed pneumatic tubes from said drive in cages into the appellant's building.

The appellee notified appellant it was moving into the building and did move in the first of July 1955 and opened for business on July 5, 1955. There seems to be nothing in the record showing that the appellant took any action to prevent the appellee from moving into the building. On August 1, 1955, appellant filed this suit against the appellee asking for $203,122.89 as the cost of the changes contemplated under the provision of the supplemental agreement, and for other relief not necessary to mention here. Although appellant in its first petition sought to recover $203,-122.89 it sought in its first amended original petition, upon which this case was tried, to recover only $152,667.25 and prayed for the following:

"1. A decree cancelling this lease and recognizing the full termination of said lease as of the date of the original filing of this suit or at such subsequent date as may be found to be the date of termination of this lease agreement.

"2. In the event and only in the event that Plaintiff should fail to recover a judgment of forefeiture and termination of the lease upon the ground of defendant's default in failing to pay Plaintiff for the cost of alterations and additions, then in such event it is prayed in the alternative that Plaintiff recover against the Defendant a judgment for the full amount of costs of such alterations and additions as herein prayed for, plus interest thereon.

"3. A judgment for rent against said Defendant in an amount calculated as herein alleged.

"4. A Writ of Possession granting to Plaintiff full possession of said leased premises.

"5. An injunction directing the Defendant to disconnect the pneumatic tube or tubes from Plaintiff's building and to discontinue such tube or tubes or other cable connections between the Great Plains Life Building and the so-called motor teller bank immediately to the North thereof; and further directing the Defendant to remove tubes and cables from and forever refrain from using any and every portion of Plaintiff's property situated either in alleys or in streets or sidewalks or over or under the same upon which Defendant has no written lease from this Plaintiff; and further enjoining the Defendant from breaking through the wall either above, below or at ground level of the Great Plains Life Building, and from passing into or upon any unleased portion of said building and/or other property belonging to Plaintiff; and enjoining the Defendant from creating or maintaining any character of entrance into the basement or any part of said building for a tunnel, pneumatic tube or any character of entrance or connection leading to said property.

"6. Recovery from Defendant of attorneys' fees, costs of suit, and any and all other and further relief, general and special, in law and in equity, as Plaintiff may show itself entitled."

It was the contention of appellee that it only owed appellant for making the changes that are made under the terms of the supplemental agreement in the sum of $18,254.82 and paid into the registry of the court that amount and prayed appellant recover nothing. Appellee filed its cross-complaint seeking judgment decreeing that it have the right of passageway between the premises it occupies in the Great Plains Life Building to the motor bank by means of an underground tunnel.

The case was tried to a jury upon 35 Special Issues. The first 26 Special Issues are concerned with whether or not the

items of expense sought to be recovered by the appellant come within the purview of the supplemental agreement. All of these issues except 7, 8, 25 and 26 were answered "no." Special Issues 7 and 8 found that $35.40 came within the supplemental agreement, and Special Issues 25 and 26 found that $2,500 architect fees come within the agreement. The remaining special issues found in favor of appellee as to its right as to the motor bank and its right to connect the same to the Great Plains Life Building by the tunnel and also the pneumatic tubes.

The trial court entered judgment for appellant for the sum of $20,790.22, and that $18,254.82 of said amount had been paid into the registry of the court and directed the clerk of the court to pay the $18,254.82 to the appellant, and that the remaining $2,535.40 was to draw interest from the date of the judgment at the rate of 6 per cent until paid or until such time as said amount is paid into the registry of the court for the use and benefit of appellant, and after said sum was paid into the registry of the court interest to cease at that time and the amount to be paid to the appellant. The judgment further provided that appellee had the right to connect the motor bank to the premises occupied by it in appellant's building by the tunnel in question, and refused all further relief. From this judgment appellant has perfected its appeal.

■ Appellant presents its first two points of error together, which are as follows:

"Point One

"The trial court erred in failing to hold that Appellant duly forfeited and cancelled the lease contract involved in this case, at a date not later than August 1, 1955.

"Point Two

"The trial court erred in holding that Appellant was not entitled to injunctive relief with respect to the pneumatic

tube and tunnel constructed by Appellee, since the evidence shows without dispute that such tube and tunnel cross through and under property owned by Appellant which has not been leased to Appellee."

We are unable to see any reason under this record where the appellant had any right to forfeit or to cancel the lease contract here involved. The jury found against appellant as to both of these points, and we think upon ample evidence. There was sufficient evidence that the appellee was given permission to connect the motor bank to the premises to be occupied by it by the tunnel and also the pneumatic tubes. Both of said points are overruled.

By appellant's third and fourth points of error it is contended that appellee did not have the right to cross property owned by appellant not leased to the appellee and to maintain the tunnel and pneumatic tubes thereon. The jury found, upon competent evidence, against the contention of appellants and held appellant had given appellee the right to construct and maintain both the tunnel and pneumatic tubes. Points three and four are overruled.

■ Appellant's point five is divided into sections (a) and (b) as follows:

"Point Five

"(a) The manner in which Appellee was operating the pneumatic tube in connection with its banking business on the leased premises, in conjunction with the operation of its banking business on nearby property also leased by it, constituted illegal branch banking which was forbidden and prohibited by the Constitution and statutes of this State, and the trial court erred in not so holding.

"(b) Since Appellee was conducting the illegal operation of branch banking on the leased premises, the express terms of the lease contract authorized Appellant to terminate such contract,

as Appellant has done, and the trial court erred in holding to the contrary."

It being the contention of appellant that because of Section 16 of Article 16 of the Texas Constitution, Vernon's Ann. St., which provides that a bank chartered under the laws of this State "shall not be authorized to engage in business at more than one place which shall be designated in its charter" and, the banking code of the State of Texas, Vernon's Ann. Civ.St. art. 342–903, which provides that "No state, national, or private bank shall engage in business in more than one place, maintain any branch office, or cash checks or receive deposit except in its own banking house," the drive in banking place, as shown in this record, constituted such illegal branch banking business as to authorize appellant to cancel its lease with the appellee. As we understand a branch bank it is a separate entity and deposits made in a branch bank are payable there and only there unless the branch bank be closed on demand for the payment by the depositor be refused, then the demand for payment will be against the mother bank. Branch banks are not mere teller's windows. For the convenience of its depositors these teller's windows were established to permit a depositor to drive in and make a deposit, and there is nothing in this record to show that the tellers of the drive in portion of the bank had any more authority than any of the tellers in the bank building proper. This drive in depository is nothing more than a part of the appellee bank. All deposits made at the teller's windows are placed in appellee bank. We have not been cited to a Texas case, and neither have we found one, directly determining that a bank can or cannot do the things as were done under this record. However, we think the reasoning as expressed in the case of Marvin v. Kentucky Title Trust Company, 218 Ky. 135, 291 S.W. 17, at page 18, 50 A.L.R. 1337, is good and is decisive of the issue where it is stated:

"If a bank occupies an entire city block, can it be doubted that it can establish an office for the receipt of deposits and payment of checks at each corner of its building and keep separate books at each place? Clearly the installation of such offices in the building is incidental to that business, and such an arrangement would have no injurious effect upon the financial management and control of the bank's business, as the officials charged with those duties do not devote their time to the details of the receipt of deposit or payment of checks. If such additional offices can be established at different points in the main building under the bank's control, no good reason appears why they may not be established elsewhere throughout the city of its location for the same purpose. The convenience to the general public of such an arrangement is easily perceived. The time consumed by a great number of depositors in making daily trips to and from banks of deposit during business hours calls for some measure of economy and renders the arrangement suggested very desirable, and as it is clearly incidental to the bank's business and neither violates the statute nor public policy and the judgment of the court limits its application to the matter of receiving deposits and paying checks, no good reason can be perceived for denying the application."

We are of the opinion, and so hold, that these drive in teller's windows are a part of appellee bank and are not branch banks, and that appellee is not violating the Constitution nor the Banking Code of the State of Texas. Appellant's point five is overruled.

Appellant's point six consists of over two pages dealing mostly with no evidence and insufficient evidence, but in presenting the point it was presented in a summarized form as follows:

"Summary Statement of Point Six

"(a) The trial court erred in failing to hold that Appellant duly and properly terminated the lease contract on or about August 1, 1955, under authority conferred in said contract, since Appellee was in default with respect to the payment due to Appellant under the lease contract for sums expended by Appellant to make the premises suitable for occupancy by Appellee; and since Appellee had not made a proper tender of a single penny of said sum, and, in particular, had not even made a proper tender of the amount which it admitted that it owed Appellant.

"(b) In the alternative, and in the event that the trial court properly held that the lease was not terminated, the trial court erred in failing to make a proper award to Appellant for the amount due and owing to it for sums expended to make the leased premises suitable for occupancy by Appellee, which amount, Appellant avers, was far in excess of the $20,790.22 which the trial court awarded it."

On March 9, 1955, appellant sent a letter to appellee requesting payment of $167,804.46 for improvements in accordance with their lease agreement. The statement showed the amount of expenditures to be $217,804.46 less the $50,000 due to be paid by appellant under the terms of the supplemental agreement. Appellee, on April 6, 1955, answered the request, stating it did not owe that amount, and stated the bank was only to participate in the items covered in the contract, and listed them, and informed the appellant if it would submit an itemized statement to include the proper invoices, it would pay the amounts due thereon less the $50,000 in accordance with the terms of the contract.

██ It is to be noticed the supplemental agreement provided that in order to make the leased premises suitable for occupancy by the lessee, it was necessary to make certain alterations and additions to the plans and specifications for completing construction of that portion of said building to be occupied by lessee in accordance with the final plans and specifications agreed upon and approved and which were to be prepared by appellant's architect. Then it provided as to what the terms of the alterations and additions were intended by the parties, and listed them and estimated their costs. The total estimate cost was $84,485. Of this estimated sum appellant was to pay $50,000 and the appellee to pay the balance. Naturally, the appellee would question a bill for $217,804.46 when it had been estimated at $84,485, and especially since the statement contained items not covered in the supplemental agreement. Such expenditures, even if such statement covered only items designated in the supplemental agreement, could not have been in the contemplation of the parties. At this time the space was not ready for occupancy, and neither did appellant comply with the request of the appellee to submit an itemized statement. There is no question but what appellant was asking appellee to pay for items the appellant had agreed to furnish, yet such items were not mentioned in the supplemental agreement. The items of expenditure were solely within the knowledge of appellant. At the time the request was made for payment appellant was in default and had not completed the building within the time specified, and at that time appellee had the right to cancel the contract if it saw fit to do so. The Supreme Court stated in the case of Gulf Pipe Line Co. v. Nearen, 135 Tex. 50, 138 S. W.2d 1065, 1068, as follows: "It is also elementary that a party to a contract who is himself in default cannot maintain a suit for its breach." We think a failure to make a formal tender may be excused if it appears that the tenderee would not have accepted the tender if made; but to avail himself thereof, the tenderer must show that he was able and desired to make the tender. The appellee informed

the appellant in effect that if it would give the appellee the proper information as to the amount due under the terms of their agreement it was ready and would pay.

 It is stated by the Supreme Court in the case of State v. Baili, 144 Tex. 195, 190 S.W.2d 71, 84, "It is an elementary rule, too well established to require the citation of authorities, that forfeitures are not favored in the law. The courts will, if possible, avoid them." We think under this record, and as found by the jury upon sufficient evidence, and since appellant was the only one knowing the amounts expended, and requests being made for payment not covered by the contract, that the request was so out of proportion to the amount due that the appellee was not obligated to make a tender other than it did. But should we be wrong in that the jury has found upon sufficient evidence the amount due appellant according to their agreement. Appellant's point six is overruled.

Appellant's point seven consists of 2½ pages dealing mostly with there being no evidence and insufficient evidence to support the jury findings as to Special Issues 27 to 35, both inclusive. Appellant in presenting this point presents it as follows:

"Summary Statement of Point Seven

"For numerous reasons, identified and discussed under the various subheadings below, the trial court erred in permitting the introduction of any evidence concerning any alleged agreement between Appellant and Appellee by which the construction of the pneumatic tube allegedly *were* authorized; by permitting the jury to consider any such matter; and by entering any judgment upon the basis of jury findings pertaining thereto."

 The doctrine of ratification had its origin in the law of agency. A corporation, like an individual, may ratify and thereby render binding upon it the origi-

nally authorized acts of its officers or other agents, and the ratification of an act done by a previously unauthorized officer or agent is, unless rights of third persons have intervened, equivalent to a prior authority and relates back and supplies the authority to do such an act, and no higher degree of evidence is requisite in establishing ratification on the part of a corporation than is requisite in showing an antecedent authorization. No third person's rights are involved herein. The appellant did not erect the sidewalk teller's cages as were originally contemplated. Even admitting, for presentation purposes, that the appellant originally did not agree to let appellee connect its drive in teller's cages to appellant's building by tunnel and pneumatic tubes or in any manner the appellee saw fit—or because Messrs. Lindsey & Dean were interested parties and could not act upon such a permit—we think under this record, and as found by the jury, the appellant acted in such manner and with knowledge as to constitute ratification in permitting the appellee to make such connection by tunnel and pneumatic tubes. Lyons v. Texorado Oil & Gas Co., Tex.Civ.App., 91 S.W.2d 375 (writ refused).

 In any event the jury's findings, which are amply sustained by the evidence, that the members of the board of directors of appellant were advised, or knew about, said agreement and acquiesced in and ratified it, would, independent of any general or special authorization, warrant us in sustaining the validity of the agreement. Where a contract has been executed in whole or in part, the courts look with disfavor upon a defense interposed by a corporation that its officers had no authority to execute it or agree upon such matters, and particularly is this true where, as here, the contract or agreement is found to be fair. There is no evidence that anything was done to the disadvantage of appellant, nor were any of their rights or interest impaired by the agreement. By not having to construct the sidewalk teller's cages

they were saved that expense. Under this record and the findings of the jury, we are of the opinion all of these actions on the part of the appellee were known to the parties and were approved and ratified until it was too late to complain.

Judgment of the trial court is affirmed.