

# The Attorney General of Texas

June 6, 1986

**JIM MATTOX**
**Attorney General**

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

714 Jackson, Suite 700
Dallas, TX. 75202-4506
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1001 Texas, Suite 700
Houston, TX. 77002-3111
713/223-5886

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

Honorable Chet Brooks
Chairman
Committee on Health and Human
    Resources
Texas State Senate
P. O. Box 12068, Capitol Station
Austin, Texas    78711

Opinion No.  JM-498

Re:  Whether article 342-903,
V.T.C.S., which broadens the
definition of "drive-in/walk-
up facility" contravenes the
constitutional    prohibition
against branch banking

Dear Senator Brooks:

Article XVI, section 16, of the Texas Constitution prohibits a bank from engaging in business at more than one location.  You ask whether a bill enacted by the Sixty-ninth Legislature amending article 342-903, V.T.C.S., the statute prohibiting so-called "branch banking," is constitutional.  In addition to the operation of detached facilities authorized by previous amendments, the 1985 amendment permits the operation of one "drive-in/walk-up facility" within 20,000 feet of the bank's central building, a distance just short of four miles.  It defines "drive-in/walk-up facility" to mean

> a facility offering banking services solely to
> persons who remain . . . in a building having a
> secured teller lobby during the transaction of
> business with the bank.

Your question arises out of a particular fact situation of which you have been apprised.  You indicate that two state banks in Dallas have merged pursuant to article 342-308, V.T.C.S.  Both state banks are wholly-owned by the same bank holding company.  Both facilities offer full banking services and operate under the name of one of the banks involved in the merger, now designated the "resulting bank." The resulting bank regards the central building of the other as its "drive-in/walk-up facility" under the purported authority of the newly-amended article 342-903, V.T.C.S., because it is located within 20,000 feet of the resulting bank's central building and because it offers banking services to persons who remain "in a building having a secured teller lobby during the transaction of business with the bank." You wish to know whether the statute, if it fairly can be read to authorize such a practice, violates article XVI, section 16, of the Texas Constitution.  We answer your question in the affirmative.

Article XVI, section 16, of the Texas Constitution provides the following:

> Sec. 16. (a) The Legislature shall by general laws, authorize the incorporation of corporate bodies with banking and discounting privileges, and shall provide for a system of State supervision, regulation and control of such bodies which will adequately protect and secure the depositors and creditors thereof.
>
> No such corporate body shall be chartered until all of the authorized capital stock has been subscribed and paid in full in cash. <u>Except as may be permitted by the Legislature pursuant to Subsection (b) of this Section 16, such body corporate shall not be authorized to engage in business at more than one place which shall be designated in its charter.</u>
>
> No foreign corporation, other than the national banks of the United States domiciled in this State, shall be permitted to exercise banking or discounting privileges in this State.
>
> (b) If it finds that the convenience of the public will be served thereby, the Legislature may authorize State and national banks to establish and operate unmanned teller machines within the county or city of their domicile. Such machines may perform all banking functions. Banks which are domiciled within a city lying in two or more counties may be permitted to establish and operate unmanned teller machines within both the city and the county of their domicile. The Legislature shall provide that a bank shall have the right to share in the use of these teller machines, not situated at a banking house, which are located within the county or the city of the bank's domicile, on a reasonable, nondiscriminatory basis, consistent with anti-trust laws. Banks may share the use of such machines within the county or city of their domicile with savings and loan associations and credit unions which are domiciled in the same county or city.
>
> (c) A corporate body created by virtue of the power granted by this section, notwithstanding any other provision of this section, has the same

rights and privileges that are or may be granted to national banks of the United States domiciled in this State. (Emphasis added).

As a preliminary matter, it has been suggested that, because of subsection (c), we should look first to federal law to determine whether the practice in which the two banks have engaged is authorized by federal law. If so, the argument runs, the practice would then be authorized by the Texas Constitution. Accordingly, we turn to 12 U.S.C. section 36, the so-called McFadden Act, which permits national banks to branch in certain limited situations.

Essentially the federal act permits the operation of a branch bank by a national bank in three situations. See generally Annots., 30 A.L.R. 927 (1924), 50 A.L.R. 1340 (1927), 136 A.L.R. 471 (1942). First, a national bank may retain any branch that it operated lawfully as of the date on which the McFadden Act became effective, February 25, 1927. 12 U.S.C. §36(a). Second, a national bank may operate a branch, with the approval of the Comptroller of the Currency, under the same conditions in which a state bank may operate a branch. 12 U.S.C. §36(c). Third, a national bank may operate a branch if the national bank resulted from a conversion of a state bank to a national bank and the state bank lawfully operated a branch prior to the conversion or if the national bank, called the "resulting bank," resulted from the consolidation or merger of a national bank with another bank. 12 U.S.C. §36(b). In this last instance, the resulting bank is authorized to operate the main office (or branch office) of the other bank if the operation of branch banks is otherwise permitted by state law and if the Comptroller of the Currency approves of its continued operation. See First National Bank v. Dickinson, 396 U.S. 122 (1969); First National Bank of Logan v. Walker Bank & Trust Co., 385 U.S. 252 (1966). See generally Annots., 52 A.L.R. Fed. 649 (1981); 23 A.L.R.3d 683 (1969). Because the operation of a branch by a national bank in the event of a consolidation or merger with another bank is still contingent upon the existence of state law permitting the operation of such a branch, federal law coupled with subsection (c) of article XVI, section 16, of the Texas Constitution does not provide any independent authority for a state bank to operate a branch in the event of a merger.

Texas is not alone in prohibiting branch banking. Eleven states currently prohibit it. Twenty-one states permit it on a less-than-statewide basis. Eighteen states permit it on a statewide basis. See generally, Schlicting, Rice and Cooper, Banking Law, Vol. I, §§5.01-5.06; 8.01-8.06. Texas, however, is the only state that prohibits absolutely branch banking in its constitution. (The Illinois constitution prohibits branch banking, but it authorizes its legislature by a specified vote to permit it). Indeed, until the adoption of article XVI, section 16, in 1904, Texas prohibited the

creation of banking corporations, not simply branches thereof; the Texas Constitutions of 1845, 1861, and 1866 each prohibited the creation of corporations with "banking or discounting privileges." Tex. Const. (1845) art. VII, section 30; Tex. Const. (1861) art. VII, section 30; Tex. Const. (1866) Art. XVI, section 30. The Constitution of 1869 did not include such a provision; it was restored in the 1876 constitution. See generally, 2 G. Braden, The Constitution of the State of Texas:  An Annotated and Comparative Analysis, pp. 739-742 (1977).  The prohibition reflected the widespread mistrust of financial organizations and the fear of concentration of financial power.  See "Interpretative Commentary" to Texas Constitution, article XVI, section 16; see generally First National Bank of Beaumont v. Union Trust Co., 155 S.W. 989 (Tex. Civ. App. 1913, writ ref'd); Burleson v. Davis, 141 S.W. 559 (Tex. Civ. App. 1911, writ ref'd).

With the adoption in 1904 of article XVI, section 16, the constitution permitted the establishment of a state banking system. The original House Joint Resolution to amend article XVI, section 16, contained no prohibition on branch banking; the House ultimately adopted an amendment containing the prohibition.  In a study submitted on August 18, 1952, by the Attorney General to the State Banking Board, this office declared at pp. 5-7:

> Although we have found no direct evidence as to the purpose and intent of the amendment [prohibiting branch banking], the history of anti-trust legislation in the 28th Legislature furnishes some explanation of how the idea of restricting corporations to one place of business came to the attention of the law makers and what was hoped to be accomplished by such a restriction.  Whereas the popular resentment in Texas against the banking business appears to have subsided to the point that the electorate saw fit to remove the former constitutional prohibition and to permit banking institutions to be incorporated under the conditions authorized in the 1904 amendment, during the years prior to 1904 there had been no lessening of popular distrust and fear of corporations in general.  Indeed, most of the intense anti-trust feeling during those years was very closely, if not entirely, associated in the public mind with abuses of the corporate form of business organization.
>
> For a number of years prior to 1903 there had been agitation for comprehensive anti-trust legislation, much of which was directly designed to limit and regulate the activities of corporate business.

> One such regulation that was widely advocated would have required that corporations in general be prohibited from "establishing or maintaining more than one plant or business," . . . and be restricted "as to its operations elsewhere. . . ."
>
>        . . .
>
> Governor Lanham's Executive Message [of February 5, 1903], suggesting among other things that corporations in general be prohibited from "operating in more than one place," was accompanied by several proposed anti-trust laws, most of which were enacted into law by the 28th Legislature. The 1903 antitrust legislation still constitutes [as of 1952] the bulk of the substantive anti-trust law of the state. Thus it is reasonable to assume that the Governor, at least, was of the opinion that a prohibition against engaging "in business at more than one place" had as one purpose the same general objective as other anti-trust measures, i.e., prevention of trusts, monopolies, and conspiracies in restraint of trade. (Emphasis added).

Pursuant to article XVI, section 16, the legislature enacted a branch banking statute, which has been amended nine times since its enactment as article 3 of Chapter IX of the Texas Banking Code of 1943. The statute originally provided: "No state, national or private bank shall engage in business in more than one place, maintain any branch office, or cash checks or receive deposits except in its own banking house." Acts 1943, 48th Leg., ch. 97, subch. IX, §3, at 164. The subsequent amendments each retained the above language but redefined and expanded the definition of "banking house."

The 1957 amendment expanded the definition of "banking house" to include office facilities whose nearest wall was located within 500 feet of the nearest wall of the central building and was physically connected to the central building by tunnel, passageway, or hallway providing direct access between the central building and the connected office facility or by pneumatic tube or other similar carrier. The amendment contained a proviso essentially requiring the connected facility to be located either within the same city block or within contiguous city blocks or within a block located diagonally across from the central building. Acts 1957, 55th Leg., ch. 220, §1, at 448. See Attorney General Opinion WW-22 (1957) (operation of a "drive-in/walk-up facility" which is located 185 feet from the bank's building, which accepts deposits, cashes checks, accepts payment on notes, and handles the application for personal loans of $500 or less, and which

is connected to the bank's building by two underground pneumatic tubes and a closed circuit television cable contravenes the constitutional proscription against engaging in business in more than one place).

The 1959 amendment amended the proviso contained in the 1957 enactment. It expanded the permissible distance between the central office and the connecting facility to within 500 feet of the street adjacent to the central building. Acts 1959, 56th Leg., ch. 123, §1, at 213.

The 1963 amendment expanded the definition of "banking house" further by dropping the proviso limiting the permissible distance between the central building and the connecting facility to contiguous city blocks. The "500 feet nearest wall-to-nearest-wall limitation" was retained, as was the requirement that the facilities be connected by either a physical structure such as a passageway or by a pneumatic tube or other similar carrier. Acts 1963, 58th Leg., ch. 81, §6, at 134.

The 1971 amendment expanded the definition of "banking house" yet again by specifically permitting the establishment in counties of at least 350,000 population one automobile drive-in facility whose nearest boundary was to be located no less than 500 feet nor more than 1,850 feet from the nearest wall of the central building and connected to the central building by either a hallway or passageway providing direct physical access between the facility and the central building or by a pneumatic tube or other similar carrier. The amendment declared:

> [T]he term 'automobile drive-in facility' as herein used shall mean a facility offering banking services solely to persons who arrive at such facility in an automobile and remain therein during the transaction of business with the bank.

Acts 1971, 62nd Leg., ch. 358, §1, at 1352.

The 1975 amendment extended the reach of the statute by dropping the population bracket. It further extended the maximum distance between the central building and the drive-in facility from 1,850 feet to 2,000 feet and required that the two be connected either by a passageway or hallway providing direct access between the two or "by closed circuit television, pneumatic tube or other physically connected delivery device." The definition of "automobile drive-in facility" remained unchanged. Acts 1975, 64th Leg., ch. 215, §1, at 531.

The 1981 amendment expanded the maximum distance that could separate the central building and the drive-in facility from 2,000

feet to 3,500 feet.  The facility was then designated "drive-in/ walk-up facility;" the amendment declared:

> [T]he term 'drive-in/walk-up facility' as herein used shall mean a facility offering banking services solely to persons who remain outside of the facility during the transaction of business with the bank.

Acts 1981, 67th Leg., ch. 611, §1, at 2410.

The 1983 amendment expanded the definition of "banking house" in three significant ways.  First, the definition was expanded to include in addition to the office facility located within 500 feet of the central building, a provision first enacted in the 1957 amendment and retained in every subsequent amendment, not more than two additional office facilities whose nearest walls were located within 3,500 feet of the central building and are physically connected to the central building either by passageway or hallway providing direct access between the central building and the connected office facility or by closed circuit television or pneumatic tube or other physically connected delivery device.  Second, the maximum distance by which a drive-in/walk-up facility was to be separated from the central wall of the main building was increased dramatically from 3,500 feet to 10,500 feet, a distance only 60 feet short of two miles.  Significantly, the definition of "drive-in/walk-up facility" was expanded to read

> a facility offering banking services solely to persons who remain outside of the facility <u>or in a secured teller lobby</u> during the transaction of business with the bank.  (Emphasis added).

Acts 1983, 68th Leg., ch. 374, §1, at 2042.

Finally the 1985 amendment expanded yet again the definition of "banking house" to authorize the erection of "drive-in/walk-up facility," in addition to those set forth in the 1983 enactment, which is located within 20,000 feet of the central building, a distance of just under four miles.  The amendment contained a proviso that forbids this additional facility to be located within the boundary lines of any city or town that has a population of less than 5,000 and in which a bank is already located.  The definition of "drive-in/walk-up facility" was amended to read:

> a facility offering banking services solely to persons who remain outside of the facility or in a <u>building having</u> a secured teller lobby during the transaction of business with the bank.  (Emphasis added).

Acts 1988, 69th Leg., ch. 484, §1, at 4100.

We turn now to your specific request. The issue is whether article 342-903, V.T.C.S., as amended, permits a bank "to engage in business at more than one place" in violation of article XVI, section 16 of the Texas Constitution. The threshold question to be addressed is whether the services offered at such facilities constitute "business" for purposes of the constitution, i.e., whether such services constitute "banking." The statute on its face does not limit the services that can be offered at such a detached facility. We assume that, at a minimum, such facilities accept deposits and permit withdrawals, i.e., accept "demand deposits." Because the definition of "drive-in/walk-up facility" set forth in article 342-903 specifies that such facility offers "banking services," it may appear super-fluous to address this question. However, two early Texas authorities seemingly concluded that the services typically offered at teller's windows were not "banking" but only incidental to banking, Great Plains Life Insurance Company v. First National Bank of Lubbock, 316 S.W.2d 98 (Tex. Civ. App. - Amarillo 1958, writ ref'd n.r.e.) and Attorney General Opinion V-1046 (1954). Consequently, even though the statute does not require it, as a practical matter banks typically limit services offered at drive-in facilities to services generally offered at teller's windows. The remaining and subsequent Texas authorities clearly assumed that the offering of such services does constitute "banking." It should be noted that the aforementioned authorities concluded that, under the factual situations that each addressed, the existence and nature of a physical connection between the bank's central building and the detached facility and the distance separating the two were such that the facilities became mere physical extensions of the central buildings. Accordingly, their precedential value as to what constitutes "engaging in business" is questionable since such holdings were unnecessary.

If the services actually offered at a "drive-in/walk-up facility" do constitute "banking," the second question must be whether the distance permissibly separating the facilities and the existence and nature of the physical connection between the two authorized by statute are such that they could be said to operate at "one place." We note that no Texas court has been confronted with this question, and the last attorney general opinion that addressed the matter was issued in 1975. Then the distance authorized by statute that could permissibly separate the bank's central building from the "drive-in/walk-up facility" was 2,000 feet as opposed to the distance now permitted, 20,000 feet, and the definition of "drive-in/ walk-up facility" did not purport to include within its ambit a detached building into which customers could enter.

The only Texas case to consider whether the operation of a drive-in facility by a bank violates the branch banking prohibition is Great

Plains Life Insurance Company v. First National Bank of Lubbock, 316 S.W.2d 98 (Tex. Civ. App. - Amarillo 1958, writ ref'd n.r.e.) [hereinafter Great Plains]. In Great Plains a lessor sued his lessee to cancel a lease of his premises for bank purposes on the theory that the bank, by operating a drive-in facility consisting of drive-in teller cages located across the street from the bank's central building and connected directly and physically thereto by a pneumatic tube, was operating an illegal branch bank in violation of article XVI, section 16, of the Texas Constitution. The court concluded that such was not the case:

> As we understand a branch bank it is a separate entity and deposits made in a branch bank are payable there and only there unless the branch bank be closed on [sic] demand for the payment by the depositor be refused, then the demand for payment will be against the mother bank. Branch banks are not mere teller's windows. For the convenience of its depositors these teller's windows were established to permit a depositor to drive in and make a deposit, and there is nothing in this record to show that the tellers of the drive in portion of the bank had any more authority than any of the tellers in the bank building proper. This drive-in depository is nothing more than a part of the appellee bank. All deposits made at the teller's windows are placed in appellee bank. We have not been cited to a Texas case, and neither have we found one, directly determining that a bank can or cannot do the things as were done under this record.

The Great Plains court seemed to rely on the reasoning set forth in a 1927 Kentucky Court of Appeals case, Marvin v. Kentucky Title Trust Co., 291 S.W. 17 (Ky. 1927). In the 1927 Kentucky case, the bank sought to operate separate offices for the purposes of cashing checks, accepting deposits, and keeping records of such transactions in different parts of a city with no direct physical connection between the central building and the ancillary offices.

The Kentucky Court of Appeals had earlier concluded that banks had no inherent right to branch; they could do so only if specifically authorized by law. Kentucky law at the time was silent as to whether banks could branch. Accordingly, the court held that they could not. Bruner v. Citizens' Bank of Shelbyville, 120 S.W. 345 (Ky 1909). The court in Marvin framed the issue thus:

> whether appellee's plan to open offices for the receipt of deposits and payment of checks will

> constitute the establishment of branch banks, so that the case may be said to turn upon the definition of banking.

291 S.W. at 17. The court of appeals noted that Bruner expressly recognized the right of a bank under Kentucky law to have as many duly appointed agents as it needs who could, inter alia, receive deposits and forward them to the bank's central office. The court concluded that such duties were

> incidental to the business . . . which do not require special discretion and business acumen.

291 S.W. at 18. The court then offered the following illustration, which Great Plains quoted:

> If a bank occupies an entire city block, can it be doubted that it can establish an office for the receipt of deposits and payment of checks at each corner of its building and keep separate books at each place? Clearly the installation of such offices in the building is incidental to that business, and such an arrangement would have no injurious effect upon the financial management and control of the bank's business, as the officials charged with those duties do not devote their time to the details of the receipt of deposit or payment of checks. If such additional offices can be established at different points in the main building under the bank's control, no good reason appears why they may not be established elsewhere throughout the city of its location for the same purpose. The convenience to the general public of such an arrangement is easily perceived. The time consumed by a great number of depositors in making daily trips to and from banks of deposit during business hours calls for some measure of economy and renders the arrangement suggested very desirable, and as it is clearly incidental to the bank's business and neither violates the statute nor public policy and the judgment of the court limits its application to the matter of receiving deposits and paying checks, no good reason can be perceived for denying the application. (Emphasis added).

Id.

The claim that the holding of Great Plains stands in support of the proposition that article 342-903, as presently amended, is constitutional is disingenuous at best. First, reference to and apparent reliance on the Kentucky case was unnecessary and inapposite; the inclusion of language from the Kentucky case is mere dicta. On the basis of the differing facts, the two cases are easily distinguishable. In the Kentucky case, the bank sought to operate separate offices for the purposes of cashing checks, accepting deposits, and keeping records of such transactions in different parts of a city with no direct physical connection between the central building and the ancillary offices. In Great Plains, on the other hand, the central building and the drive-in facility were physically connected directly by a pneumatic tube and the facility was located across the street from the bank's building. The holding in Great Plains is necessarily limited to its facts.

Second, the Great Plains case itself is unclear as to what rationale it employed in order to determine whether the questioned practice constitutes branch banking. The Kentucky case upon which the Great Plains court ostensibly relied predicated its holding upon a "services offered" approach, i.e., the services offered were merely incidental to banking and the offer of such services did not constitute "banking." Therefore, the establishment of facilities that provided such services at locations far removed from the central bank building were not denominated branch banking. That is why the court, while acknowledging that Kentucky law did not authorize branch banking, concluded that there was no impediment to the bank establishing such offices throughout the city.

Arguably then, Great Plains stands for the proposition that the services typically offered at a "drive-in/walk-up facility" do not constitute "engag[ing] in business" and therefore do not fall within the ambit of the article XVI, section 16, proscription. However, the Great Plains court also focused upon the existence and nature of the physical connection between the bank's central building and the detached facility and the distance separating the two -- a "physical connection approach" -- and specifically held that the facility was nothing more than a part of the bank. It concluded that it was, in effect, an extension of the bank's central building, rather than a branch. If the drive-in facility in Great Plains were a mere physical extension of the bank's central building, then no article XVI, section 16, question was implicated and any discussion of the nature of the services offered is surplusage. On the other hand, if the nature of the services offered at the drive-in facility did not constitute banking, then any discussion as to whether the facility is a branch or a part (or extension) of the bank's central building is superfluous. At most, Great Plains stands for the proposition that a drive-in facility, ancillary to the central building though contiguous and

physically connected to it by pneumatic tube, is merely an extension of the central building.

In Attorney General Opinion V-1046 (1950), this office concluded that the construction on another lot directly across the street from the bank's "banking house" of a garage that contains a drive-in deposit window or windows which accept deposits and permit withdrawals and that is permanently and structurally attached to the bank's building by a tunnel suitable for passage back and forth did not contravene the constitutional prohibition on branch banking.  The reasoning employed in the opinion, just as that employed in the later Great Plains case, is unclear; it too failed to distinguish between a "services offered" test, which of course relies upon an analysis of the definition of banking and the services offered at the off-premises facility, and a "physical connection" test, which assumes as a given that the services offered at such a facility are "banking" and focuses upon the nature of the "physical connection" between the two facilities in order to determine whether the additional facility is in fact "off-premises." The opinion also relied upon and quoted extensively from the aforementioned Kentucky case and seemed to hold that the services offered did not constitute banking; yet, at the conclusion of the opinion, it apparently held that the contemplated structure would become, as it were, a mere extension of the physical structure of the central building and would therefore not violate the statutory prohibition of cashing checks or accepting deposits at any place other than the bank's "banking house."  It should be obvious, however, that, if the services offered do not constitute "banking," then the constitutional issue would not come into play; the only limitations would then be those contained in the statute.  There would be no constitutional impediment to keep a bank in, say, Amarillo from operating such a facility in Orange.  On the other hand, if a structural connection of some defined sort is deemed sufficient to create one facility out of two, then, again, no constitutional question arises.

The remaining Attorney General Opinions all assumed that the sorts of services offered at "drive-in/walk-up facilities" constitute "banking."  Unlike Great Plains and Attorney General Opinion V-1046, which arguably concluded that such services are not "banking" but rather are incidental to banking, all implicitly invoked first the "services offered" test and assumed that the offering of such services is banking; they focused then on the "physical connection" test and analyzed whether the offering of such services in various situations is "off-premises."  Attorney General Opinions H-1292 (1978); H-1084 (1977); H-277 (1974); H-100 (1973); M-915, M-849 (1971); M-273 (1968); WW-22 (1957); Letter Advisory No. 96 (1975).

Attorney General Opinions M-273 (1968), M-915 (1971), H-100 (1973), H-277 (1974), and H-1292 (1978) all considered whether the use of unmanned (or automated) teller machines, when used in various fact

situations, constituted "banking." The services offered ranged from the accepting and receipting of bank deposits, Attorney General Opinion M-273, to the cashing of checks (or withdrawal of cash from accounts or dispensing of cash packets after an account verification), Attorney General Opinions M-915, H-277, H-1292, to withdrawal of cash from bank checking or savings accounts, accepting deposits to checking or savings accounts, accepting inter-account transfers, and accepting payments to a credit card account, Attorney General Opinion H-100, supra. All of the opinions concluded, either implicitly or explicitly, that such services, the same sorts of services typically offered by a "drive-in/ walk-up facility," are "banking." In Attorney General Opinion M-273, supra, this office declared:

> [T]he user of a mechanical contrivance to perform these operations will not render them non-banking operations which are outside the general and usual rules governing and restricting branch banking. "Branching" is defined by both state and federal law in terms of end results and not in terms of any instrumentality or agency by which such results are accomplished . . . . In our opinion the facilities described in your letter are clearly banking facilities.

The operation of unmanned (or automated) tellers (sometimes known as CBCTs, i.e. Customer-Bank Communication Terminals) was finally authorized by the 1980 amendment adding subsection (b) to article XVI, section 16, of the Texas Constitution after an earlier amendment authorizing their operation was defeated in 1977. See V.T.C.S. art. 342-903c.

Attorney General Opinion M-849 and Attorney General Letter Advisory No. 96, which addressed whether the 1971 and 1975 amendments to article 342-903, respectively, were constitutional, also assumed that the sorts of services typically offered at a "drive-in/walk-up facility" are "banking." Attorney General Opinion M-849 quoted with approval from Kaliski v. Gossett, 109 S.W.2d 340, 344 (Tex. Civ. App. - San Antonio 1937, writ ref'd.), which contains the following language:

> In the case of In re Prudence Company (C.C.A.) 79 F.(2d) 77, 79, we find the following definition of a bank: 'Strictly speaking the term bank implies a place for the deposit of money, as that is the most obvious purpose of such an institution'; the opinion continues: 'And all of the cases, so far as we are advised, which have construed the words "banking corporations" as used in the Bankruptcy Act, have regarded the legal power to receive

deposits as the essential thing.' [Citations omitted].

As this office declared in Attorney General Opinion WW-22(1957):

> While the powers of a state bank in Texas are enumerated in Article 342-301, V.T.C.S., most of the decisions throughout the United States recognize that the ordinary essential features of the banking business are the power to accept deposits of money repayable to the order of the depositor, the discounting of commercial paper, the issuance of negotiable notes, and the lending of money upon security. Warren v. Shook, 91 U.S. 704, 23 L. Ed. 421, 9 C.J.S. 31; Zollmann, Banks and Banking, Volume I, Section 67.

> Many of the decisions and authorities throughout the United States recognize that not all of these banking functions need be exercised in order to constitute an institution a bank. The exercise of some of the functions of banking such as loaning money, selling bonds, receiving deposits or cashing checks may be sufficient to bring the institution within the regulations passed by the state relative to banks. Kaliski v. Gossett, 109 S.W.2d 340 (Tex. Civ. App. 1937); Zollmann, Banks and Banking, Volume I, Section 67.

See also Brenham Production Credit Association v. Zeiss, 264 S.W.2d 95 (Tex. 1953).

Indeed, a brief submitted to this office by the Texas Bankers' Association in connection with Attorney General Opinion H-1084 (1977) claimed that the taking of deposits was essential to the definition of a "banking business" and cited U.S. v. Philadelphia National Bank, 374 U.S. 321 (1963) for the following proposition: "Commercial banks are unique among financial institutions in that they alone are permitted by law to accept demand deposits." The brief went on to cite a series of cases from various jurisdictions, including Texas, essentially in support of that proposition.

It is suggested that the recent case of Board of Governors of Federal Reserve System v. Dimension Financial Corporation, _____ U.S. _____, 106 S.Ct. 681 (1986) [hereinafter Board of Governors], which strictly construed the definition of "bank" for purposes of the Bank Holding Company Act of 1956, 12 U.S.C. §§1841 et seq., is relevant to this discussion. The Bank Holding Company Act defines "bank" as any institution "which (1) accepts deposits that the depositor has a

legal right to withdraw on demand, and (2) engages in the business of making commercial loans." 12 U.S.C. §1841(c) (Emphasis added.) In Board of Governors, the Supreme Court struck down board rules promulgated pursuant to the act that it felt employed an overly-expansive definition of "bank." Under the Bank Holding Company Act (which applies both to state and national banks), a "bank" must both accept demand deposits and engage in commercial banking. If such a definition were applied to the services typically offered at a "drive-in/walk-up facility," it is argued, then such a facility could not be held to engage in banking. The case is inapposite for three reasons.

First, the provisions of the Bank Holding Company Act are inapplicable to both the McFadden Act and Texas case law definition of "bank." This office noted the following in Attorney General Opinion H-606 (1975):

> Pursuant to its authority to assess state law in the regulation of bank holding companies, Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 379 U.S. 411 (1965), the Federal Reserve Board has held Texas' branch banking laws to be inapplicable to stock ownership by holding companies. Application of Farmers and Mechanics Trust Company of Childress, Texas (Federal Reserve Bulletin, January, 1960, pp. 14, 16); cf. Application of Trans-Nebraska Co., Lincoln, Nebraska (Federal Reserve Bulletin, May, 1963, pp. 633, 634). This ruling was based on the legislative history of the Banking Holding Company Act of 1956 which states in part:

> The purposes of branch banking laws are not identical with the purpose of this bill to control bank holding companies . . . It is believed the bill contains adequate provisions to regulate bank holding company operations without an arbitrary tiein [sic] with branch banking laws. 1956 U.S. Code Cong. Ad. News, 84th Congress 2492-2493.

Second, the definition of "branch bank" set forth in the McFadden Act is of greater relevance to this inquiry than the definition contained in the Bank Holding Company Act. The McFadden Act provides the following at 12 U.S.C. §36(f):

> The term 'branch' as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch agency, additional office, or any branch place of

> business . . . at which deposits are received, or
> checks paid, or money lent.

The Supreme Court has declared that

> the term 'branch bank' at the very least includes
> any place for receiving deposits or paying checks
> or lending money apart from the chartered
> premises; it may include more.  It should be
> emphasized that, since [the act] is phrased in the
> disjunctive, the offering of any of the three
> services mentioned in that definition will provide
> the basis for finding that 'branch' banking is
> taking place.

First National Bank in Plant City, Florida v. Dickinson, 396 U.S. 122, 134 (1969).

While the determination as to what constitutes a branch is admittedly a matter of federal law, the court's construction is persuasive since the act was intended to foster "competitive equality" between state and national banks.  First National Bank of Logan v. Walker Bank & Trust Co., 385 U.S. 252, 261 (1966).  For this reason, a branch of a national banking association may be established only when, where, and how state law would authorize a state bank to establish and operate such a branch.  St. Louis County National Bank v. Mercantile Trust Company National Association, 548 F.2d 716 (8th Cir. 1976), cert. denied 433 U.S. 909 (1977).

Third, the statute authorizes a "drive-in/walk-up facility" to offer "banking services" without either specifying or limiting just what services may be offered.  The fact that any specific "drive-in/walk-up facility" does not offer a full range of "banking services" is irrelevant when the issue is whether the statute that authorizes the offering of "banking services" is constitutional.

In spite of the language seemingly to the contrary in Great Plains and Attorney General Opinion V-1046, we think that the great weight of authority in Texas and in other jurisdictions, as well as the plain language of article 342-903, support the proposition that the sorts of services typically offered at a "drive-in/walk-up facility," which at a minimum include withdrawal of cash from and accepting deposits to banking accounts, do constitute "banking."  The remaining issue is whether the sort of physical connection and the authorized distance separating the central building and the facility permitted by the statute violate the constitutional prohibition against "engag[ing] in business at more than one place."  We conclude that, taken together, they do.

No Texas case has defined specifically the meaning of the phrase "one place" for purposes of article XVI, section 16(a). To the extent that Great Plains can be said to construe the phrase, the case stands only for the proposition that a bank that operates a "drive-in/walk-up facility" located across the street from the bank's central building and connected therewith by a pneumatic tube can be said to engage in business in not more than one place. Since the fact situation considered therein is almost identical to that considered in Great Plains, Attorney General Opinion V-1046 (1950) can also be so characterized. Both Attorney General Opinion M-849 (1971) and Letter Advisory No. 96 (1975) discussed specific proposed amendments to article 342-903, but neither attempted to define what actually constitutes "one place."

The claim that both stand in support of the proposition that article 342-903, as presently amended, is constitutional mischaracterizes both. First, Attorney General Opinion M-849 specifically did not rule on the constitutionality of the 1957 amendment or the 1963 amendment, amendments which expanded the definition of "banking house" far less dramatically than did the 1985 amendment:

> This Office has never issued an opinion as to the constitutionality of the 1957 amendment or the 1963 amendment to article 342-903, and nothing in this present opinion is intended as a ruling thereon.

Second, Attorney General Opinion M-849, which considered the constitutionality of what subsequently became the 1971 amendment, declined to hold as a matter of law that the proposed amendment did not contravene the constitutional prohibition:

> Both H.B. 566 [which was substantially enacted as the 1971 amendment] and S.B. 409 have eliminated from the concept and definition of 'banking house' the physical connection aspect of the statute, as it now exists, and authorize a banking house to be connected only by closed circuit television or other similar means of communication.
>
> If this office were to hold that a 'banking house' could be authorized to extend its place of business 500 feet or 1,850 feet from its main banking house, connected only by closed circuit television or other similar means of communication, then we would have to conclude that this manner of connection between the main banking house and its drive-in windows, or office facilities, irrespective of the distance, would be

compatible with the constitutional provisions. We
cannot so conclude as a matter of law, because the
bills fail to provide sufficient factors and
guidelines to support that conclusion.

The opinion failed to specify exactly what "factors" or "guidelines"
would have been sufficient to warrant a conclusion. The opinion
concluded that the meaning of the phrase "one place" in article XVI,
section 16,

is constitutionally a mixed question of law and
fact, [and] any ultimate finding of 'one place'
under the Constitution must take into account all
of the relevant facts and circumstances pertaining
to the doing of the banking business at 'one
place.'

The opinion then declined to rule on any hypothetical question or any
mixed question of law and fact that might conceivably arise in apply-
ing the proposed statutes to any given state of facts.

Attorney General Letter Advisory No. 96 (1975), considering what
was subsequently enacted as the 1975 amendment that permitted the
physical connection separating the central building and the detached
facility to be merely a closed circuit television cable and expanded
the permissible distance separating the two to 2,000 feet, noted the
paucity of authority at the time Attorney General Opinion M-849 was
issued and declared:

In the context of Senate Bill No. 642 and its
limitation of the distance of separation [expanded
from 1,850 feet to 2,000 feet], we can determine
no meaningful distinction between a connection by
pneumatic tube and one by closed circuit tele-
vision cable. In both instances the bank's
business in [sic] conducted in 'one place' within
the meaning of section 16, so long as the drive-in
facility is limited to teller services. (Emphasis
added).

The opinion failed to explain by virtue of what constitutional,
statutory, or case law authority such facilities could be limited to
teller services.

So at most, Attorney General Opinion M-849 stands for the
proposition that the question whether a "drive-in/walk-up facility"
located 1,850 feet from the bank's central building is a branch is a
mixed question of law and fact. Attorney General Letter Advisory No.
96 at most stands for the proposition that, in an instance in which a

"drive-in/walk-up facility" is located not more than 2,000 feet from the bank's central building, a connection as tenuous as a closed circuit television cable permits banking business to be conducted in "one place." When these opinions were issued there was an admitted dearth of judicial authority in this area, from either Texas or other jurisdictions. We need not determine, however, the meaning of "one place" for purposes of article XVI, section 16, because a 1980 constitutional amendment has done it for us.

In November of 1980, the voters of Texas adopted a constitutional amendment that re-enacted article XVI, section 16, and added what is now subsection (b), permitting banks to operate detached automated teller facilities. An earlier attempt to amend the section to permit the operation of such facilities failed of passage in 1977. In order to permit the operation of such detached facilities, a constitutional amendment was necessary because, absent an amendment, such operation would have violated the constitutional proscription against "engag[ing] in business at more than one place." Attorney General Opinions H-1292 (1978); H-277 (1974); H-100 (1973); M-915 (1971). The amendment as adopted, provided the following:

> Section 1. That Article XVI, Section 16, of the Texas Constitution be amended to read as follows:
>
> 'Sec. 16. Corporations with banking and discounting privileges
>
> (a) The Legislature shall by general laws, authorize the incorporation of corporate bodies with banking and discounting privileges, and shall provide for a system of State supervision, regulation and control of such bodies which will adequately protect and secure the depositors and creditors thereof.
>
> No such corporate body shall be chartered until all of the authorized capital stock has been subscribed and paid in full in cash. Except as may be permitted by the Legislature pursuant to Subsection (b) of this Section 16, such body corporate shall not be authorized to engage in business at more than one place which shall be designated in its charter.
>
> No foreign corporation, other than the national banks of the United States domiciled in this State, shall be permitted to exercise banking or discounting privileges in this State.

(b) If it finds that the convenience of the public will be served thereby, the Legislature may authorize State and national banks to establish and operate unmanned teller machines within the county or city of their domicile. Such machines may perform all banking functions. Banks which are domiciled within a city lying in two or more counties may be permitted to establish and operate unmanned teller machines within both the city and the county of their domicile. The Legislature shall provide that a bank shall have the right to share in the use of these teller machines, not situated at a banking house, which are located within the county or the city of the bank's domicile, on a reasonable, nondiscriminatory basis, consistent with anti-trust laws. Banks may share the use of such machines within the county or city of their domicile with savings and loan associations and credit unions which are domiciled in the same county or city.' (Emphasis added).

When properly construing a constitutional provision, we are required to give effect to the intent of the people who adopted it. Director of the Department of Agriculture and Environment v. Printing Industries Association of Texas, 600 S.W.2d 264 (Tex. 1980); Cox v. Robison, 150 S.W. 1149 (Tex. 1912). The meaning of a constitution is fixed when it is adopted and is not different at any subsequent time. Jones v. Ross, 173 S.W.2d 1022 (Tex. 1943); Cramer v. Sheppard, 167 S.W.2d 147 (Tex. 1943). In attempting to determine such intent,

[c]onstitutional provisions, like statutes, are properly to be interpreted in light of conditions existing at the time of their adoption, the general spirit of the times, and the prevailing sentiments of the people.

Mumme v. Marrs, 40 S.W.2d 31, 35 (Tex. 1931). As the Texas Supreme Court later declared,

[I]n determining the meaning, intent and purpose of a constitutional provision the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied, and the good to be accomplished, are proper subjects of inquiry.

Markowsky v. Newman, 136 S.W.2d 808, 813 (Tex. 1940); Travelers' Insurance Co. v. Marshall, 76 S.W.2d 1007 (Tex. 1934).

When subsection (b) was added in 1980, which by its very terms serves as an exception to the constitutional proscription against banking "at more than one place," and the entire section was re-adopted, the operation of certain detached facilities was already permitted by statute. We think that a court, relying on the above rules of constitutional construction, would probably conclude that the inclusion of the phrase "banking house" in subsection (b) and the re-adoption of the entire section in 1980 served to place the imprimatur of the people on the then-existing statutory scheme defining "banking house," expanding and defining, as it were, the constitutional phrase "one place." The statutory amendment of article 342-903 then in effect provided the following:

> No State, national or private bank shall engage in business in more than one place, maintain any branch office, or cash checks or receive deposits except in its own banking house. For purposes of this article 'banking house' means the building in whose offices the business of the bank is conducted and which is functionally one place of business, including (a) office facilities whose nearest wall is located within five hundred (500) feet of the nearest wall of the central building and is physically connected to the central building by tunnel, passageway or hallway providing direct access between the central building and the connected office facility or by closed circuit television or pneumatic tube or other physically connected delivery device, and (b) in addition, if authorized in the manner hereinafter provided, not more than one (1) automobile drive-in facility whose nearest boundary is located within two thousand (2,000) feet of the nearest wall of the central building but more than five hundred (500) feet therefrom and is connected to the central building by tunnel, passageway or hallway providing direct access between the central building and the connected automobile drive-in facility or by closed circuit television, pneumatic tube or other physically connected delivery device. The entire banking house shall for all purposes under the law be considered one integral banking house. The term 'automobile drive-in facility' as herein used shall mean a facility offering banking services solely to persons who arrive at such facility in an automobile and remain therein during the transaction of business with the bank.

Since the adoption of the 1980 constitutional amendment, article 342-903, V.T.C.S., has been amended three times. The maximum distance

that may permissibly separate the bank's central building from a "drive-in/walk-up facility" was increased from 2,000 feet to 3,500 feet to 10,500 feet to 20,000 feet, almost a trebling in one session followed by a doubling in the next -- a ten-fold increase during the past six years. The definition of "drive-in walk-up facility" was amended during the past two legislative sessions with the effect that a multi-story office building now falls within its ambit. If the legislature may permissibly double (or triple) in each succeeding legislative session the maximum distance that may separate a bank's central building and its "drive-in/walk-up facility" (which may now fairly be construed to be an office building), the maximum boundary conceivably could soon be coterminous with the boundaries of the state. Such a situation is certainly one which the constitutional prohibition is intended to prevent.

Clearly, in passing upon the constitutionality of a statute, we are required to begin with a presumption of constitutionality. Smith v. Davis, 426 S.W.2d 827 (Tex. 1968); Ex parte Smith, 441 S.W.2d 544 (Tex. Crim. App. 1906). A statute should not be declared unconstitutional unless it is plainly so. Maud v. Terrell, 200 S.W. 375 (Tex. 1918). Article 342-903, V.T.C.S., as amended, is plainly so. The meaning of the words of a constitution at the time they were placed therein cannot be altered or amended by subsequent legislation. Ex parte Giles, 502 S.W.2d 774 (Tex. Cr. App. 1973). The 1985 statutory amendments to V.T.C.S. article 342-903 about which you inquire manifestly were attempts to do so.

We are not unmindful of the effect of our decision. But as the Texas Supreme Court declared in Koy v. Scheider, 218 S.W. 479, 481 (Tex. 1920), the consequences of constitutional interpretation do not control.

> No matter how far-reaching and disastrous would be the consequences . . . we would not decline to make the declaration if such was believed to be the true intent of the language of the Constitution.

Quoted in Director of the Department of Agriculture and Environment v. Printing Industries Association of Texas, supra. Cramer v. Sheppard, 167 S.W.2d 147 (Tex. 1943). See Shepherd v. San Jacinto Junior College District, 363 S.W.2d 742 (Tex. 1962).

Accordingly, in the situation which gave rise to your request, we conclude that the central building of the merged bank which the resulting bank now regards as its "drive-in/walk-up facility" is, as a matter of fact and law, an impermissible "branch." We conclude that the 1985 amendment to article 342-903, V.T.C.S., which extends the permissible distance separating a "drive-in/walk-up facility" from the

bank's central building to 20,000 feet and permits such facility to be a "building having a secured teller lobby" is unconstitutional.

## S U M M A R Y

The 1985 amendment to article 342-903, V.T.C.S., which extends the permissible distance separating a "drive-in/walk-up facility" from the bank's central building to 20,000 feet and permits such facility to be a "building having a secured teller lobby" is unconstitutional.

Very truly yours,

*Jim Mattox*

J I M   M A T T O X
Attorney General of Texas

JACK HIGHTOWER
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

ROBERT GRAY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jim Moellinger
Assistant Attorney General